Ex Parte Ward Roper.

No. 916.  Decided December 7, 1910.

Rehearing Denied February 8, 1911.

1.—Contempt—Partnership—Injunction—Local Option.

Where, upon trial of habeas corpus in this court, it appeared that in the contempt proceedings in the District Court under a writ of injunction enjoining the relator and others from the illegal sale of intoxicating liquors in local option territory, the petition for injunction alleged relator's partnership with another in the business of such sale, and that relator's answer denying such partnership was not sworn to, it will be assumed that such partnership existed; besides the evidence showed that relator was connected with such business, and there was no error in finding relator guilty of contempt for a violation of such writ.

**2.—Same—Constitutional Law—Sale of Intoxicating Liquors—Local Option—Trial by Jury.**

The District Court has authority to issue a writ of injunction against one who unlawfully engages in the sale of intoxicating liquors in local option territory or threatens to do so, on the ground that the same is a public nuisance, under the Act of the Thirtieth Legislature, upon petition of the State or any private citizen; and to punish for contempt a violation of such writ of injunction; and such act or proceeding is not in violation of section 10 of the Bill of Rights providing that in all criminal prosecutions the accused shall have a speedy public trial by an impartial jury, and does not contravene or repeal Article 3 of the Penal Code defining the scope of the Penal Code. Following Ex Parte Allison, 48 Texas Crim. Rep., 634, and other cases. Davidson, Presiding Judge, dissenting.

**3.—Same—Writ of Injunction not Void because of Power beyond Prayer of Petition.**

Where the writ of injunction went beyond the prayer of the petition it was not therefore void on matters which were embraced therein, and for a violation of which relator was enjoined in contempt proceedings.

**4.—Same—Preliminary Writ of Injunction—Right of Trial—Mandamus.**

Where a preliminary injunction is once granted it continues in force, in the absence of a motion to dissolve, and where no deliberate refusal for a trial is shown the relator in contempt proceedings has no right to mandamus to compel such trial, or to be heard to say that such proceedings are invalid.

**5.—Same—Additional Punishment—Subsequent Law—Remedy.**

On habeas corpus, a relator who was fined for contempt for violating a writ of injunction restraining him from the sale of intoxicating liquors in local option territory, cannot oppose such contempt proceedings on the ground that the local option election was held before the Act of the Legislature allowing such injunction was passed, and that thereby an additional penalty for a violation of the local option law had been imposed; the said legislative act being merely a statute of regulation affecting the remedy in aid of the enforcement of the local option law.

**6.—Same—Constitutional Law—Former Jeopardy—Same Officers.**

The Act of the Thirtieth Legislature providing for an injunction against the unlawful sale of intoxicating liquors in local option territory is not a law imposing additional punishment for the same offense, and does not contravene Section 14 of the Bill of Rights providing that no person for the same offense shall be twice put in jeopardy of life or liberty.

**7.—Same—Stare Decisis.**

Where a question of law has been thoroughly settled by the decisions of the courts of last resort, this court is reluctant to break away from such precedent.

**8.—Same—Jurisdiction—Court of Last Resort—Civil Case.**

Where, upon original habeas corpus proceedings in the Court of Criminal Appeals, relator asked to be released from a commitment for contempt for violating a writ of injunction restraining him from the unlawful sale of intoxicating liquors in local option territory, issued upon petition of the State from the District Court, the proceeding is in the nature of a civil case which under some conditions may finally reach the Supreme Court which has ruled adversely to relator on a similar question, and polity suggests that the Court of Criminal Appeals should hesitate to interfere to avoid a conflict of jurisdiction.

**9.—Same—Public Policy—Aid to Local Option.**

See opinion for a discussion of the public policy involved in the Act of the Thirtieth Legislature providing for writs of injunction restraining the unlawful sale of intoxicating liquors in local option territory, as an aid in the enforcement of the local option law, in communities adopting the same.

**10.—Same—Nature of Relator's Interest in Sale of Intoxicating Liquors.**

Where it wàs shown, upon original habeas corpus proceedings in the Court of Criminal Appeals, by the record from the District Court in contempt proceedings enjoining relator and his agents from the sale of intoxicating liquors in local option territory, that he had leased a house where the alleged unlawful sales had occurred, had procured Federal and State liquor licenses therefor, and that the business was conducted under the shelter and sanction of his name, etc., he could not claim a discharge because he had no financial interest in the business, or had not personally sold· intoxicating liquors in violation of said writ of injunction.

From Johnson County.

Original habeas corpus proceeding asking release from custody under a judgment of contempt by the District Court for violating a writ of injunction restraining the unlawful sale of intoxicating liquors in local option territory.

The opinion states the case.

*Odell & Johnson,* for relator.—The injunction as a remedy is resorted to for the purpose of preventing the injury threatened to property or civil rights, because that injury is irreparable, and not for the purpose of furnishing a more speedy and effectual punishment for the crime as crime that might be done in committing such injury: Mugler v. Kansas, 123 U. S., 623; State v. Patterson, 14 Texas Civ. App., 465; Ex parte Warfield, ·40 Texas Crim. Rep., 413.

Now if the rule laid down in the Patterson case, supra, is the correct rule, and that (as the Allison opinion seems to admit) an injunction will not be granted for the purpose of enjoining the commission of crime as crime, and will not lie for the purpose of preventing the commission of a criminal offense, simply because it is a criminal offense, then the law under which this case is prosecuted, be it either chapter 77 or chapter 81 of the Acts of the Thirtieth Legislature, is contrary thereto. And unless the Legislature had the right, as suggested in the Allison opinion, to define and declare the commission of any penal offense of the law of this State to be a nuisance, and to authorize the injunction of the commission of such offense, and the subsequent punishment for contempt of court for the infraction of said injunction, as an aid to and in lieu of the enforcement of the criminal law, denouncing and punishing such offense, then the Act of the Legislature under which this case is prosecuted is unconstitutional, and the Legislature had no authority to enact the same.

What was the moving cause which induced the Legislature to select this particular remedy by injunction to enforce a law or punish acts for which the law had proven inadequate? Every man in this State who is at all informed knows it was to find a remedy other than a trial by jury. It was to avoid the trial by jury and to escape it. It is admitted in this court's opinion in the Allison case that as a general proposition of law the courts will not enjoin the commission of a criminal offense. If, then, this Act provides for the

punishment of a criminal offense, or for not refraining from the commission of such offense (and the Legislature says it intended it for such), it is in violation of the Bill of Rights under which all criminal prosecutions are to be tried by an impartial jury. Section 10, Bill of Rights, Constitution of Texas; dissenting opinion in this case; Acts of Thirtieth Legislature, 1907, p. 166; chapters 77 and 81, Laws of 1907.

On question of former jeopardy: Section 14, Bill of Rights, Constitution of Texas.

On question that Legislature can not add a penalty for a violation of the local option law which did not exist at the time of the adoption of the local option law in the territory affected: Lewis v. State, 58 Texas Crim. Rep., 351.

On question that no person shall be punished for any act or omission unless the same is made a penal offense, counsel for relator cited article 3, Penal Code, and contended that the injunction Act virtually repealed this article of the Code; and if it did not repeal it and the Legislature intended to adopt a new method of punishment by injunction, then the same contravened sections 10 and 14, Bill of Rights.

Counsel filed an able argument in support of the above propositions.

*C. E. Lane*, Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—On October 29th of this year an application for writ of habeas corpus was presented to Judge McCord of this court, was by him granted, and the case set down for submission before the full bench on November 9th of the present year.

The application is based on a number of grounds, all of which will be hereafter noticed. It appears in the record that about the 17th day of December, 1909, the county attorney of Johnson County made application to Hon. O. L. Lockett, judge of the Eighteenth Judicial District, alleging in substance that Ward Roper and R. B. Roper, who are alleged to be partners, had made application through relator, Ward Roper, to secure a license to engage in the sale of liquor on prescription. At this time local option was in effect in Johnson County, and had been for some years; that subsequent to this and a short time before the filing of the petition for injunction relator had violated the provisions of said license and had made sales of whisky to certain persons named in the petition. After setting all of these matters out in great detail, the petition contains the following averment: "Plaintiff would further aver that R. B. Roper and Ward Roper, doing business as druggists in the place above mentioned, have under the pretense of selling and dispensing intoxicating liquors on a prescription in said Johnson County, Texas, where the unlawful sale of intoxicating liquors has been prohibited by law since the 19th day of June, 1904, and up to the filing of this petition, sold said intoxicating liquors in violation of the law, as above mentioned, and have thereby become the

creators and promoters of a common and public nuisance that ought and should be abated." The petition prays, therefore, for a writ of injunction to issue restraining relator and R. B. Roper, or either of them, their agents, servants, employes and assigns from selling or permitting to be sold, or kept for the purpose of unlawful sale any intoxicating liquors in their said place of business situated in Cleburne, Johnson County, Texas, as above mentioned, and from creating and promoting a common and public nuisance at their place of business. In his fiat indorsed on said petition on the 17th day of December, the district judge directed the issuance of a writ of injunction as prayed for. The injunction, which was in fact issued, goes rather beyond the terms of the petition and is to this effect: "You, your agents and employes are hereby commanded to restrain and desist from in any manner or way selling intoxicating liquors in any place in Johnson County, Texas, and from establishing, maintaining or conducting in any place in said county where intoxicating liquors are sold, kept or drank, and from permitting the same to be sold, stored, kept or drank in any place controlled by you, your agents in said county, until the further order of said District Court." In the answer of relator, which included a number of matters as grounds of resisting the attempted imprisonment, it is alleged as a matter of fact, by relator Ward Roper, that he had no financial interest in the business which, he says, was conducted by his son R. B. Roper. He admits in this answer that he had obtained the license from the State, as well as the federal license, on account of the fact that his son R. B. Roper was then a minor and presumably unable to obtain same, and that he took it out for his son. It is shown further in the testimony of relator that he rented the building in which was conducted the business, but claims that this was for his son. The answer was not sworn to. The petition charges a partnership between R. B. Roper and Ward Roper. In the absence of any denial of partnership, the court is authorized to assume its existence. Besides, if such inquiry could be permitted there is evidence in the record sufficient to show relator's connection with the business. On hearing the court found relator guilty of a violation of the injunction, and assessed a fine against him of $100, and adjudged that he be confined in the county jail for two days.

1. Among other grounds of relief it is urged that the District Court has no authority to issue an injunction under conditions as disclosed in this record, for the reason that in substance it is an attempt to prevent the commission of crime by an injunction, and that this is not permitted or sanctioned by law. Almost this precise question came before this court in the case of Ex parte Allison, 48 Texas Crim. Rep., 634. The injunction in that case was issued by Hon. O. L. Lockett, restraining Allison from the use of certain premises as a gaming house. Passing on this question Judge Henderson, speaking for the court, says:

It is urgently insisted by relator that the injunction granted was

without authority of law, because it was an attempt on the part of the court to enjoin the commission of a criminal offense. This contention may be conceded as a general proposition. State v. Patterson, 14 Texas Civ. App., 465, 37 S. W. Rep., 478; Ex parte Warfield, 40 Texas Crim. Rep., 413. However, the respondent insists that the grant of the injunction in this case was not an attempt to enjoin the commission of a criminal offense, but was an injunction granted against the use of property, the using thereof constituting it a nuisance; and furthermore, respondent urges that, notwithstanding, under the English system of equity jurisprudence, which has come down to us, that courts will not enjoin the commission of crime as crime, yet it is entirely competent for the Legislature to create other matters the subject of equitable cognizance than those recognized under the general system of equity.

"With regard to the first proposition, we believe it will be conceded that where property rights are involved, courts will issue injunctions notwithstanding it may embrace a crime; or if it should not be so conceded, we believe, on principle and authority, that this proposition can not be gainsaid. It will be noted that the Act in question is aimed at the restraining of persons from using certain premises or buildings, for the purpose of gaming, or of keeping or exhibiting games prohibited by the laws of this state; and does not seek to punish such persons for so using said premises or buildings. As was said in Warfield's case, 40 Texas Crim. App., 413, 'An injunction is a mere restraining order, and it will be presumed that the party against whom it is granted will obey it as long as it continues in force; otherwise, as the issuance of the writ is a proper exercise of equity, he will move to dissolve it. A gambling house, under our statute and as recognized by our courts, is a nuisance, and even at common law, as we understand it, such a nuisance could be enjoined at the instance of any one who was injured thereby. Our statute enlarges this right, and assumes that any person within the jurisdiction is injured, and that he can make complaint and have the restraining order issued. Patterson v. State, supra, relied on by relator, recognizes the rule that a gambling house is a nuisance and can be abated; and that the writ will lie when property or civil rights are involved and some irreparable injury to such rights is threatened or about to be committed for which no adequate remedy exists at law. It is said further: 'The injury threatened to such rights may, if committed, constitute a crime, and subject its perpetrator to punishment under the criminal law, yet, as his punishment would furnish him whose property or civil rights had been irreparably injured by the acts constituting the offense no compensation for such injury, courts of equity will interfere to prevent such an injury, notwithstanding the commission would constitute a criminal offense, not because it would be a crime, but because the injury to such rights would be irreparable. It can not be said that such interference by a court of equity is an invasion into the domain of

criminal law, for no crime has been committed where equity inter-
poses its arm for the protection of property or civil rights. In ex-
tending such protection, it may prevent a crime; but, as no one has a
right to commit crime, no one should be heard to complain that he is
restrained from its commission, when such restraint has been exercised
in the jurisdiction of a court for the purpose of preventing him from
irreparably injuring another in his property or civil rights.' The
court in that case even recognizes the right of the State, through her
proper officers, to enjoin a public nuisance, but that the State must
show in such case that the nuisance is an injury to the property or
civil rights of the public at large. It was there held that the State
did not show such injury to property or civil rights of the public, and
an injunction would not lie. This case was decided before the Act of
the Legislature upon which the injunction at bar was granted, was
passed. The Act in question was evidently passed to meet the defects
pointed out by the court. Here it is provided that such injunction
may issue at the instance of any citizen of the State, who is authorized
to sue in his own name; and that such person shall not be required
to show that he is personally injured by the acts complained of.
Now, if the Legislature was lawfully authorized to make the provisions
in the law, as above pointed out, no one can question the legality of
the writ of injunction; and it lies with those challenging the power of
the Legislature to point out that provision of the Constitution inhibit-
ing the Legislature from passing such an Act. And see Carleton v.
Rugg, 5 Law Rep. Ann., 193, and for authorities, 11 Am. & Eng.
Ency. of Law, pp. 195-197. It must be presumed that the Legislature
recognized that the use of such property for gaming purposes was in-
jurious to the public welfare and morals of the community; and un-
der its police power it had the right to enjoin such use." Later this
same case came before our Supreme Court. See Ex parte Allison, 99
Texas, 455. That case, as the record will show, was most elaborately
briefed and thoroughly considered. Chief Justice Gaines, speaking for
the court, in his usual masterly style, disposes of this contention in this
manner:

"It is also urged in argument, in a somewhat indefinite way, that
the enjoining of crimes or public nuisances was unknown to the com-
mon law, and that therefore the Legislature was without power to pro-
vide for such injunction. This involves the question whether the pro-
cedure provided for in the Act is 'due course of the law of the land.'
This question has been answered by the Supreme Court of the United
States in the case of Mugler v. Kansas, 123 U. S., 623. There the
court say: 'Equally untenable is the proposition that proceedings in
equity for the purposes indicated in the thirteenth section of the stat-
ute are inconsistent with due process of law.' 'In regard to public
nuisances,' Mr. Justice Story says, 'the jurisdiction of the courts of
equity seems to be of a very ancient date, and has been distinctly
traced back to the reign of Queen Elizabeth. The jurisdiction is ap-

plicable not only to the public nuisances, strictly so-called, but also to purpresture upon the public rights and property. . . . In case of public nuisances, properly so-called, an indictment lies to abate them, and to punish the offenders. But an information, also, lies in equity to redress the grievances by way of injunction.' (2 Story's Eq., secs. 921, 922.) 'The ground of this jurisdiction in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual and permanent remedy than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of only new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury.' If it be asserted that the procedure for the prevention of crime is novel and unknown to the common law, the answer is obvious. It seems that from the days of Edward the Confessor it was competent for any subject of the realm of England to cause any person to be brought before a magistrate, and to compel him to enter into an obligation, with sureties, to keep the peace, not only as against the complaining party, but also as against all persons in general. (4 Blackstone Com., 251.)

"Besides the whole of title 3 of our Code of Criminal Procedure is devoted to the means for the prevention of crime, and provides very much of the same remedies as were allowed at common law. Such being the facts, we fail to see that there is any peculiarity about the writ of injunction, or any peculiar sanctity about criminal or quasi criminal acts, which debar the Legislature from providing that one may be enjoined by a suit in equity from establishing a public nuisance —such as a gaming house." There is also a most satisfactory treatment of this question by the Court of Appeals in Kentucky, in the case of Respass v. Commonwealth, 115 S. W., 1131, where they considered quite a similar question. That court says:

"But it was earnestly insisted that the rule should not be applied to nuisances which affect only the morals of the community. We can not see the force of the distinction. The State is interested in the character of its people, no less than in their health or personal safety. The character of a State depends upon the character of the individuals constituting it. If the people become depraved the State can not long exist. If they have wealth it may have all that goes to make a great State, and yet, if its men are without character, it is a crumbling ruin. The State is as much interested in restraining those things which destroy the character of its people as in those things which destroy their health or personal security. A house such as is described here is not only a rendezvous for the vicious, but a training school to make others

like them. That such a house is a public nuisance has been often declared. See Bollinger v. Commonwealth, 98 Ky., 574, 55 S. W., 553; Cheek v. Commonwealth, 79 Ky., 359; Commonwealth v. Enright, 98 Ky., 635, 33 S. W., 1111; Commonwealth v. Respass, 50 S. W., 549, 21 Ky. Law Rep., 140; Cawein v. Commonwealth, 61 S. W., 275, 22 Ky. Law Rep., 1734. To say that a court of equity may not enjoin a nuisance of this sort, when the criminal laws have proven inadequate, is to say that the commonwealth is unable to protect its citizens. If it may protect its citizens by injunction from such a use of property, as would breed a pestilence among the people, upon what principle can it be maintained that it may not by injunction prevent that use by which, while it does not destroy the body, destroys the character, and leaves only the image of a man, unfitting him for the duties of citizenship? We held in Commonwealth v. McGovern, that a court of equity may enjoin the owner of property from allowing it to be used for a prize fight, which congregated upon it a large body of that class of persons that are described here. The same conclusion in effect has recently been reached in State v. Canty, 207 Mo., 439, 105 S. W., 1078, 15 L. R. A. (N. S.), 747, by the Supreme Court of Missouri, where a bill like that before us was filed by the Attorney-General to enjoin the defendant from continuing to manage and conduct a public exhibition known as 'bull-fighting' and 'bull-baiting.' The court went very fully into the authorities, and granted the injunction. In Columbian Athletic Club v. State, 143 Ind., 98, 40 N. E., 914, 28 L. R. A., 727, 52 Am. St. Rep., 407, the court granted the injunction restraining a prize fight, the decision being substantially the same as in Commonwealth v. McGovern. In State v. Olympic Club, 47 La. Ann., 1095, 17 South., 599, the same conclusion was reached, and the use of property for a prize fight was enjoined. A like conclusion was reached in State v. Saunders, 66 N. H., 39, 25 Atl., 588, 18 L. R. A., 646; Chicago Fair Grounds Association v. People, 60 Ill. App., 488, and Reaves v. Oklahoma, 13 Okla., 396, 74 Pac., 951. See also Attorney-General v. Jamaica Pond Aqueduct, 133 Mass., 361; State v. Crawford, 28 Kan., 726, 42 Am. Rep., 182; Re Debs, 158 U. S., 564, 15 Sup. Ct., 900, 39 L. Ed., 1092; Attorney-General v. Hestley, 1 Ch., 560 (Eng.); People v. Truckee Lumber Company, 116 Cal., 397, 48 Pac., 374, 39 L. R. A., 581, 58 Am. St. Rep., 183; note to Akers v. Marsh, 9 Am. & Eng. Dec. in Equity, 453; Mercer County v. City of Harrodsburg, 66 S. W., 10, 23 Ky. Law Rep., 1744, 56 L. R. A., 583; Attorney-General v. Hunter, 16 N. C., 12." Other authorities might be cited in support of the right of the State in such case to proceed by way of injunction, but what we have cited seems conclusive.

2. Again, it is urged as grounds of release that the writ of injunction goes beyond the power of the court to restrain appellant from the unlawful use of property and to engage in unlawful sales, but effectually restrains him from selling under prescription and in accordance with the law. It may be conceded that the writ, as issued, goes be-

yond the prayer in the petition for injunction and beyond the precise limits authorized by law. This would not, however, render the injunction granted absolutely void, but so far as the court was authorized to issue an injunction it would and should be upheld. This, as we understand, was directly held by our Supreme Court in Ex parte Testard, 101 Texas, 250. In that case the Supreme Court says: "The petition and the writ in this case undoubtedly stated a case in which, under the decision referred to, the right to the injunction existed, and the ticket which relator is charged with selling fell within the class thus protected. If the petition and writ went further, and it were conceded that it was to that extent invalid, the concession would not help the relator. He sold a ticket the sale of which, under any view, was properly enjoined. But we can not admit the proposition that he had the right to disregard any part of the writ. We think it proper to say further that, if it were conceded that the courts of the State are without power to protect carriers of passengers in their interstate, as well as in their intrastate transportation, this could not avail. The injunction applied also to intrastate tickets, and that in question belonged to that class. But we are unable to see that the power of the courts of the State to protect the business of carriers of passengers from unlawful interference is at all affected by the character of the business, as interstate or intrastate." Therefore, this matter can not avail appellant as ground of relief. It was his right, certainly—perhaps his duty—to have moved for a modification of the injunction. He was not authorized, merely because it was too sweeping, to disregard it altogether.

3. Again, it is complained and urged that the proceedings are invalid, and that appellant was entitled to release for that two terms of court intervened after the temporary writ of injunction had been issued, and there had been no trial, nor had there been any order issued continuing the injunction in force. The contention is in substance, as we understand, that this in effect denied appellant the right of a speedy trial and enjoined him in respect to matters involved without an opportunity for a hearing. It seems manifest that where a preliminary injunction is once granted, in the absence of a motion to dissolve same, or any action of the court in respect thereto, that it continues in force until the matter is finally heard and determined. If there had been a deliberate refusal of the court to proceed with the case at all, on a proper showing, it is clear that relator would have a right to mandamus to compel such hearing. In this record, however, it does not appear that any hearing was ever in fact demanded or refused. It simply appears that the injunction was issued in December and the case had not been disposed of when these proceedings were had in the October following. In this condition and pending a hearing, it was the duty of relator to stay his hand to respect the law, and he will not be heard when he violates the court's mandate to complain, or when visited with the punishment the law authorizes, that he had not been

given a speedy trial where no such trial had been demanded in the original case.

4. Again, it is urged that the proceedings were invalid for that the local option election alleged was held in Johnson County in April, 1904; that the law authorizing an injunction herein was not passed until 1907, and since said law authorized an additional penalty for violation of this law as applying to an election theretofore held, it imposes an additional burden, is ex post facto and invalid. It seems to us that there is no merit in this contention. It is not provided by the Act in question that any additional punishment shall be visited on one violating the local option law for any sale made contrary to its provision. This is merely a statute of regulation, a statute affecting the remedy in aid of the law, and in no sense is a different or additional penalty added thereto. Laws which affect the remedy or procedure merely are not within the scope of the inhibition against retroactive laws, unless the remedy be entirely taken away, or so encumbered with conditions as to render it useless or impracticable. De Cordova v. Galveston, 4 Texas, 473; Morris & Cummings v. State, 62 Texas, 728; Languille v. State, 4 Texas Crim. App., 312; Rowland v. State, 12 Texas Crim. App., 418, sec. 4. Nor can it be maintained that the Act in question is invalid because it denies the right of trial by jury. The right of trial by jury in respect to the offense against the law is not controverted by this Act. The matter inquired into by the court in this proceeding relates strictly to the matter of contempt and to the violation of the court's order. This was clearly held by this court in Ex parte Allison, 48 Texas Crim. Rep., 634, supra.

5. Nor is it correct to say that this law imposes an additional punishment for the same offense. In treating this precise question in Ex parte Allison, 99 Texas, 455, supra, Judge Gaines says:

"Nor do we think that the Act in question infringes that provision of the Bill of Rights which declares that 'no person, for the same offense, shall be twice put in jeopardy of life or liberty.' It is true that if he commits the act which he is enjoined from committing, and such act be a violation of the penal laws of the state, he may under this statute be punished for contempt, and also for the violation of the criminal law. But these are not 'the same offense.' In the former case he is punished for a violation of the orders of the court, and in the latter for an offense 'against the peace and dignity of the State.' One who makes an assault in the presence of the court, in such a manner as to constitute a contempt of court, is punishable, not only for the contempt, but also for the assault."

We have thus treated at some length all the matters urged by relator as grounds of release. They are all without merit, and for the most part are well settled by this court and our Supreme Court. We have, however, had before us recently a number of cases involving these questions. Their importance and the almost entire change in the personnel of this court within recent years has seemed to be sufficient

reason why we should again review the questions and decide them. They all seem to us to be without merit, and upon an inspection of the entire record and careful consideration of same, we have been led to the conviction that there is no ground shown in the application entitling relator to a release, and it is, therefore, ordered that he be and he is hereby remanded to the custody of the sheriff of Johnson County, Texas.

*Relator remanded to custody.*

DAVIDSON, PRESIDING JUDGE (dissenting).—In view of the two recent decisions, Ex parte Allison, 48 Texas Crim. Rep., 634, in this State holding that the ancillary writ of injunction, equitable only in nature and operation, can be used as original process in the enforcement of the criminal laws and penal statutes for the violation of such laws and statutes, it may be useless for me now to further dissent, but I do so looking to the future for a return to correct principle in regard to the questions involved. When the question for the first time came before this court in Ex parte Allison, 48 Texas Crim. Rep., 634, I entered my dissent and gave a few reasons for so doing. I thought it was but one of those diversions which occasionally arise in the history of national and judicial life, and would soon pass. But in this I may be wrong, and may have thought far afield of what may ultimately happen. I have thought further, and seriously so, over the matter in the light of the opinion rendered by our Supreme Court, and the one written by Judge Ramsey in this case, as well as the original opinion in 48 Texas Crim. Rep., 634, and I am now the more fully convinced that these decisions are not in accord with our law as it should be or as it was intended to be, or as has been understood by our people and the legal profession in the history of our State. I do not believe those opinions are correct, nor do I believe they announce the correct rule in the administration of our criminal law under the questions raised in this case and in those of Ex parte Allison. While for the present any dissent that I may enter will avail nothing, I yet, nevertheless, do this in order that I may not willingly as a judge be committed to the doctrine that criminal laws can be enforced and penal offenses punished under the ancillary equitable writ of injunction, and that such writ can be substituted for indictments and jury trials thereunder. The history of our race and jurisprudence have always provided as the remedy in penal offenses the trial by jury. Our Constitution is based upon the right of trial by jury in criminal cases. Of this trial the accused may not be deprived under any circumstances, especially in felonies; nor can he be deprived of it in a misdemeanor unless he expressly waives it. The Codes, penal and procedure, point to and revolve around the right of trial by jury, and that right is the central thought of our entire system of criminal and constitutional law. The Constitution guards and protects that right in the most emphatic commanding language and with guaranties that can not be

legally evaded or set aside either by construction or legislative cob-
webby. When our people ordained in the Bill of Rights that "in all
criminal prosecutions the accused shall have a speedy public trial by
an impartial jury," they meant what they said. They did not mean
such trial could or should be held under the writ of injunction. It
was not even contemplated by them in the ordaining of that provision
in the Constitution that such a contingency could or would arise. The
history of our race, its jurisprudence, legislation and constitutions,
preclude the idea that an accused person could or should be tried under
such writ. The process of punishment by injunction for penal of-
fenses, however ingeniously put, is but an insidious attack upon the
constitutional right of trial by jury and upon the form and framework
of our government by side-line legislation and decision which must be
destructive of jury trials if carried to final results  In part now the
right to try penal offenses is transferred under injunction process to
the judge only without the consent of the accused, and to this extent
the jury trial is curtailed and denied. This point having been reached,
it may furnish easy facilities upon occasion to destroy the right of
trial by jury and regulate the enforcement of criminal laws and pun-
ishment thereunder to the writ of injunction, and this to the exclu-
sion of a jury trial and at the hands of the judge only. In that event
the constitutional, demanding right of jury trial becomes a relic of
past constitutional government. This bulwark of our liberties may be
thus set aside and made of non-effect, as was the Mosaic law by the
substitution of the tradition of the elders under Jewish history and
dispensation. I am not yet persuaded that all statutes are law, or
that there is authority of omnipotent power confided to legislative
bodies, especially while the Constitution is recognized as a basic prin-
ciple of government. The history of Texas will show, and the history
of our people, I think, will demonstrate that they have been opposed to
government by injunction. Our people have struggled against it, de-
nied the right, embraced it in platforms of parties, and yet the Legis-
lature is upheld in such legislation by our courts of last resort. I
place this dissent upon record without intending any reflection upon
either the esteemed judges or courts who have differed with me, and
with a full recognition of their devotion to duty and patriotic love of
country.

Without giving further reasons at present, I therefore respectfully
enter this my dissent.

ON REHEARING.

February 8, 1911.

HARPER, JUDGE.—In this case, on a former day of this term, re-
lator was remanded. Soon thereafter a motion for rehearing was filed
on his behalf. In view of the retirement of Judge McCord by the ex-
piration of his term of office, and the resignation of Judge Ramsey,
and the fact that the personnel of the court has so much changed, it

seems appropriate and due to the parties interested that we should notice at some length the several grounds set up in the motion.

All the matters relied on originally and now urged in motion for rehearing were discussed at considerable length in the original opinion which was delivered by Judge Ramsey, and it seems unnecessary for us to take up these several matters in detail. The substantial questions relied on as a basis for the writ were distinctly held adversely to relator in the case of Ex parte Allison, 48 Texas Crim. Rep., 634. Being dissatisfied with the result of that proceeding, soon thereafter Allison made application for writ of habeas corpus to our Supreme Court. On hearing, in an elaborate opinion delivered by Judge Gaines in 99 Texas, 455, the same conclusion was reached, and practically all the matters relied upon by Allison there and relied upon by relator here were decided and adjudged adversely to the contentions of relator urged in this case. The Allison case in both courts, as the official reports will show, was most thoroughly and elaborately argued by counsel of the highest ability, and the opinions of both courts contain intrinsic evidence of the fact that the matters were exhaustively investigated and that the questions presented received the most careful consideration. There is nothing new in the law of this case, or any view of the law arising from the facts to differentiate or distinguish it from the Allison case, and unless, therefore, we were prepared to break away from the decisions of both this court and the Supreme Court, we must and should hold adversely to relator in this case. I heartily agree with Judge Ramsey in the following strong statement made by him in the case of Lewis v. State, 58 Texas Crim. Rep., 351, 127 S. W. Rep., 808:

"We have found it, therefore, unnecessary to state our own opinion. For the reasons given here, we feel that at this late date to sweep aside the established rule and unsettle the law still further would be, if not judicial usurpation, at least without sufficient warrant in law and utterly inexcusable, and to proclaim ourselves as unworthy to sit on this high tribunal. It should never be forgotten that this is a land where the law reigns supreme. Uniformity and certainty of decision is of the highest importance. We are not so much to declare our personal views of what the law ought to be, but to lay down with as much definiteness and certainty as may be what it is, and, when so adjudged, to enforce it with inflexible fidelity, without passion, and without weakness. If, coming to this high position of power and responsibility, I may, moved by a mere personal opinion, in my day and time, unsettle and undo the work of the great men who have preceded me, consistent, coherent, and undoubted from the day when I was yet a briefless lawyer, the man who on the morrow takes my place will have the same warrant to undo and unsettle the rules we establish, and so on to the end of time. So that, from having a country governed, controlled and regulated by law, we shall have a land where the mere personal

opinions of the judge in office at the time shall rule the fortunes and control and mar the destinies of a free people, and by force of an election, where such punishment was never considered, condemn the citizen to penal servitude as a felon for an act not held to be such under the decisions of this court time out of mind. Against this doctrine of personal rule and unrestrained absolutism we resolutely set our faces, and prefer to follow the law as it has been so long and so often declared, conscious of our responsibility, and saying with all sincerity of the law that it must and will be upheld, and that, though it slay me, yet will I trust in it."

The same view of the high duty owing by a judge was thus well expressed by Justice White, now Chief Justice of the Supreme Court of the United States, in the case of Pollock v. Farmers' Loan & Trust Co., 157 U. S., 429, where he says:

"The conservation and orderly development of our institutions rest on our acceptance of the results of the past, and their use as lights to guide our steps in the future. Teach the lesson that settled principles may be overthrown at any time, and confusion and turmoil must ultimately result. In the discharge of its functions of interpreting the Constitution this court exercises an august power. It sits removed from the contentions of political parties and the animosities of factions. It seems to me that the accomplishment of its lofty mission can only be secured by the stability of its teachings and the sanctity which surrounds them. If the permanency of its conclusions is to depend upon the personal opinions of those who, from time to time, may make up its membership, it will inevitably become a theatre of political strife, and its action will be without coherence or consistency. There is no great principle of our constitutional law, such as the nature and extent of the commerce power, or the currency power or other powers of the federal government, which has not been ultimately defined by the adjudications of this court after long and earnest struggle. If we are to go back to the original sources of our political system, or are to appeal to the writings of the economists in order to unsettle all these great principles, everything is lost and nothing saved to the people. The rights of every individual are guaranteed by the safeguards which have been thrown around them by our adjudications. If these are to be assailed and overthrown, as is the settled law of income taxation by this opinion, as I understand it, the rights of property, so far as the Federal Constitution is concerned, are of little worth. My strong convictions forbid that I take part in a conclusion which seems to me so full of peril to the country. I am unwilling to do so, without reference to the question of what my personal opinion upon the subject might be if the question were a new one, and was thus unaffected by the action of the framers, the history of the government, and the long line of decisions by this court. The wisdom of our forefathers in adopting a written constitution has often been impeached upon the theory that the interpretation of a written instrument did not afford

as complete protection to liberty as would be enjoyed under a constitution made up of the traditions of a free people. Writing, it has been said, does not insure greater stability than tradition does, while it destroys flexibility. The answer has always been that by the foresight of the fathers the construction of our written Constitution was ultimately confided to this body, which, from the nature of its judicial structure, could always be relied upon to act with perfect freedom from the influence of faction, and to preserve the benefits of consistent interpretation. The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our Constitution will, in my judgment, be bereft of value, and become a most dangerous instrument to the rights and liberties of the people."

Not only is this view of our duty, as I think, conclusive of qualified judges, but there is yet another view from the force and correctness of which, as it seems to me, there can be no escape. The suit out of which this application grew was a civil suit pending in the District Court of Johnson County which might, under some conditions at least, finally reach the Supreme Court of this State, and in respect to which its jurisdiction and judgment might be involved and applied. It was a case in which, in the nature of things, since we have no civil jurisdiction, this court can never take cognizance. Now, would it not be indeed an anomaly to say that for disobedience of an injunction issued in a civil case, of which we could never obtain jurisdiction, that we would, for a disobedience thereof, discharge an offender where in the appellate court to which his case would go no such discharge could be obtained? Would it not be an anomaly resulting in legal anarchy to say that if one enjoined in respect to a matter such as is involved in this case, that if he went across the hall to the Supreme Court and made application to that great tribunal for a discharge, he would be told that under the law as there set up and as heretofore settled in this court, no relief could be granted him, and that he would only have to walk across the hall to receive from this court an immunity bath, receive a discharge and absolution from all his sins, and sent on his way rejoicing with a new song of peace and triumph in his mouth? Such a state of affairs no good citizen, it seems to me, can contemplate without alarm. For myself, I am unwilling to see this court made the dumping and clearing house of those who would defy the just authorities of the court. Besides, almost this identical question has received the express approval very recently of this tribunal. In the case of Ex parte Marie Morgan, 57 Texas Crim. Rep., 551, which was a petition for writ of habeas corpus on account of an arrest for the violation of an injunction against the keeping of a bawdy house, the proceeding

was upheld, and the relator refused a discharge. That case did not in terms present the identical question here presented, but was inevitably and of necessity involved in it. In the case of Lane v. Bell, 115 S. W. Rep., 918, out of which Ex parte Morgan, supra, grew, a law substantially similar to that here attacked, and a proceeding almost identical to the one here assailed, was by the Court of Civil Appeals upheld and sustained.

In this connection, the following quotation from the opinion of Judge Gaines in Ex parte Allison, 99 Texas, 455, is worthy of note:

"It is also urged in argument, in a somewhat indefinite way, that the enjoining of crimes or public nuisances was unknown to the common law, and that therefore the Legislature was without power to provide for such injunction. This involves the question whether the procedure provided for in the Act is 'due course of the law of the land.' This question has been answered by the Supreme Court of the United States in the case of Mugler v. Kansas, 123 U. S., 623. There the court say: 'Equally untenable is the proposition that proceedings in equity for the purposes indicated in the thirteenth section of the statute are inconsistent with due process of law." 'In regard to public nuisances,' Mr. Justice Story says, 'the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable not only to public nuisances, strictly so-called, but also to the purpresture upon public rights and property. . . . In case of public nuisances, properly so-called, an indictment lies to abate them, and to punish the offenders. But an information, also, lies in equity to redress the grievances by way of injunction' (2 Story's Eq., secs. 921, 922). The ground of this jurisdiction in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual and permanent remedy than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury.' If it be asserted that the procedure for the prevention of crime is novel and unknown to the common law, the answer is obvious. It seems that from the days of Edward the Confessor it was competent for any subject of the realm of England to cause any person to be brought before a magistrate, and to compel him to enter into an obligation, with sureties, to keep the peace, not only as against the complaining party, *but also as against all persons in general.* (4 Blackstone Com., 251.)

"Besides, the whole of title 3 of our Code of Criminal Procedure is

devoted to the means for the prevention of crime, and provides very much of the same remedies as were allowed at common law. Such being the facts, we fail to see that there is any peculiarity about the writ of injunction, or any peculiar sanctity about criminal or quasi criminal acts, which debar the Legislature from providing that one may be enjoined by a suit in equity from establishing a public nuisance—such as a gambling house.

"We deem it unnecessary to pursue this discussion further. The principal objections urged against the validity of the act have been fully and ably discussed in the cases of Mugler v. Kansas, 123 U. S., 623; Littleton v. Fritz, 65 Iowa, 488, and Carleton v. Rugg, 149 Mass., 550, previously cited, and in all of which the validity of similar statutes was upheld. (See, also, State v. Saunders, 66 N. H., 39, in which the main question. is exhaustively discussed in an opinion characteristic of that eminent court.) In this same case, upon a writ of habeas corpus sued out by this relator before our Court of Criminal Appeals, that court maintained the constitutionality of the act in question, and remanded the relator to the custody of the sheriff. That court within its jurisdiction is a court of equal dignity and authority with this court. Courts will not declare an act of the Legislature invalid as being in conflict with the constitution, unless it appear to them to be clearly so. For a stronger reason, they should not so declare where the validity of the statute has been upheld by another court of last resort."

The Supreme Court of the United States, Mr. Justice Miller, rendering the decision in Eilenbecker et al. v. District Court of Plymouth County, Iowa (134 U. S., 31), in passing on the questions in this case, says:

"The judgment which we are called upon to review is one affirming the judgment of the District Court of Plymouth County in that State. This judgment imposed a fine of five hundred dollars and costs on each of the six plaintiffs in error in this case, and imprisonment in the jail of Plymouth County for a period of three months; but they were to be released from confinement if the fine imposed was paid within thirty days from the date of the judgment.

"This sentence was pronounced by the court as a punishment for contempt in refusing to obey a writ of injunction issued by that court, enjoining and restraining each of the defendants from selling, or keeping for sale, any intoxicating liquors, including ale, wine and beer, in Plymouth County, and the sentence was imposed upon. a hearing by the court, without a jury, and upon evidence in the form of affidavits.

. . .

"The first observation to be made on this subject is, that the plaintiffs in error are seeking to reverse a judgment of the District Court of Plymouth County, Iowa, imposing upon them a fine and imprisonment for violating the injunction of that court, which had been regularly issued and served upon them. Of the intentional violation of

this injunction by plaintiffs we are not permitted to entertain any doubt, and, if we did, the record in the case makes it plain. Neither is it doubted that they had a regular and fair trial, after due notice, and opportunity to defend themselves in open court at a regular term thereof.

"The contention of these parties is, that they were entitled to a trial by jury on the question as to whether they were guilty or not guilty of the contempt charged upon them, and because they did not have this trial by jury they say that they were deprived of their liberty without due process of law within the meaning of the Fourteenth Amendment to the Constitution of the United States.

"If it had ever been understood that proceedings according to the common law for contempt of court have been subject to the right of trial by jury, we have been unable to find any instance of it. It has always been one of the attributes—one of the powers necessarily incident to a court of justice—that it should have this power of vindicating its dignity, of enforcing its orders, of protecting itself from insult, without the necessity of calling upon a jury to assist in the exercise of this power.

"In the case in this court of Ex parte Terry, 128 U. S., 289 (32:405), this doctrine is fully asserted and enforced, quoting the language of the courts in the case of Anderson v. Dunn, 19 U. S., 6 Wheat., 204, 227 (5:242,247), where it was said that 'courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect and decorum in their presence, and submission to their lawful mandates;' citing with approbation the language of the Supreme Judicial Court of Massachusetts in Cartwright's Case, 114 Mass., 230, 238, that 'the summary power to commit and punish for contempt tending to obstruct or degrade the administration of justice is inherent in courts of chancery and other superior courts, as essential to the execution of their powers and to the maintenance of their authority, and is part of the law of the land, within the meaning of Magna Charta and of the twelfth article of our Declaration of Rights.'

"And this court, in Terry's Case, held that a summary proceeding of the Circuit Court of the United States without a jury, imposing upon Terry imprisonment for the term of six months, was a valid exercise of the powers of the court, and that the action of the Circuit Court was also without error in refusing to grant him a writ of habeas corpus. The case of Terry came into this court upon application for a writ of habeas corpus, and presented, as the case now before us does, the question of the authority of the Circuit Court to impose this imprisonment on a summary hearing without those regular proceedings which include a trial by jury, which was affirmed. The still more recent cases of Ex parte Savin, 131 U. S., 267 (33:150), and Ex parte Cuddy, 131 U. S., 280 (33:154), assert very strongly the same prin-

ciple. In Ex parte Robinson, 86 U. S., 505, 19 Wall., 505 (22:205), this court speaks in the following language:

" 'The power to punish for contempts is inherent in all courts. Its existence is essential to the preservation of order in judicial proceedings, and the enforcement of the judgments, orders and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power.' . . .

"So far from any statute on this subject limiting the power of the courts of Iowa, the Act of the Legislature of that State, authorizing the injunction which these parties are charged with violating, expressly declares that for violating such injunction a person doing so shall be punished for the contempt by a fine of not less than five hundred or more than a thousand dollars, or by imprisonment in the county jail not more than six months, or by both such fine and imprisonment, in the discretion of the court. So that the proceeding by which the fine and imprisonment imposed upon these parties for contempt in violating the injunction of the court, regularly issued in a suit to which they were parties, is due process of law, and always has been due process of law, and is the process or proceeding by which courts have from time immemorial enforced the execution of their orders and decrees, and can not be said to deprive the parties of their liberty or property without due process of law.

"The counsel for plaintiffs in error seek to evade the force of this reasoning by the proposition that the entire statute under which this injunction was issued is in the nature of a criminal proceeding, and that the contempt of court of which these parties have been found guilty is a crime for the punishment of which they have a right to trial by jury.

"We can not accede to this view of the subject. Whether an attachment for a contempt of court, and the judgment of the court punishing the party for such contempt, is in itself essentially a criminal proceeding or not, we do not feel it necessary to decide. We simply hold that, whatever its nature may be, it is an offense against the court and against the administration of justice, for which courts have always had the right to punish the party by summary proceeding and without trial by jury; and that in that sense it is due process of law within the meaning of the Fourteenth Amendment of the Constitution. We do not suppose that that provision of the Constitution was ever intended to interfere or abolish the powers of the courts in proceedings for contempt, whether this contempt occurred in the course of a criminal proceeding or of a civil suit.

"We might rest the case here; but the plaintiffs in error fall back upon the proposition that the statute of the Iowa Legislature concerning the sale of liquors, under which this injunction was issued, is itself void, as depriving the parties of their property and of their lib-

erty without due process of law  We are not prepared to say that this question arises in the present case.  The principal suit in which the injunction was issued, for the contempt of which these parties have been sentenced to imprisonment and to pay a fine, has never been tried so far as this record shows.  We do not know whether the parties demanded a trial by jury on the question of their guilty violation of that statute.  We do not know that they would have been refused a trial by jury if they had demanded it.  Until the trial of that case has been had they are not injured by a refusal to grant them a jury trial.  It is the well-settled doctrine of this court that a part of a statute may be void and the remainder may be valid.  That part of this statute which declares that no person shall own or keep, or be in any way concerned, engaged or employed in owning or keeping any intoxicating liquors with intent to sell the same within this State, and all the prohibitory clauses of the statute, have been held by this court to be within the constitutional powers of the State Legislature, in the cases of Mugler v. Kansas, 123 U. S., 623 (31:205), and Powell v. Pennsylvania, 127 U. S., 678 (32:253).

. "If the objection to the statute is that it authorizes a proceeding in the nature of a suit in equity to suppress the manufacture and sale of intoxicating liquors which are by law prohibited, and to abate the nuisance which the statute declares such acts to be, wherever carried on, we respond that, so far as at present advised, it appears to us that all the powers of a court, whether at common law or in chancery, may be called into operation by a legislative body for the purpose of suppressing this objectionable traffic; and we know of no hindrance in the Constitution of the United States to the form of proceedings, or to the court in which this remedy shall be had.  Certainly it seems to us to be quite as wise to use the processes of the law and the powers of the courts to prevent the evil as to punish the offense as a crime after it has been committed.

"We think it was within the power of the court of Plymouth County to issue the writs of injunction in these cases, and that the disobedience to them by the plaintiffs in error subjected them to the proceedings for contempt which were had before that court."

In Rhodes v. Saunders, 18 L. R. A., 646, is a compilation of authorities, all holding that the statute authorizing the issuance of a writ of injunction in this character of case is valid, and that courts have the power to punish for contempt without the intervention of a jury, quoting approvingly the following language:  "Every place where a public statute is openly, publicly, repeatedly, continuously, persistently and intentionally violated, is a public nuisance and may be suppressed."

The question presented in the dissenting opinion of Judge Davidson, in respect to these statutes and proceedings, operating to deny a citizen the right of trial by jury, is opposed to the decisions of this court and our Supreme Court, and the rule generally obtaining elsewhere. We might content ourselves with the above statement.  There are sub-

stantial reasons vitally affecting the quiet and welfare of the citizenship of the State which were moving considerations before the Legislature for inducing the enactment of 'these laws, and which are also strong reasons and considerations why they should be here sustained. The legislative history of the last few years will demonstrate that in practically all legislation in support and aid of local option laws, in respect to gaming and houses of prostitution, men of widely differing views, with reference to the sale of intoxicating liquors under the sanction and safeguards of the law in communities where public opinion sustained such sale, have united in one common bond of fraternity to enact such legislation as might make prohibitory laws effective in communities and sections where such laws had been voted. Again, it is a fact known of all men that in almost every great city and center of this State where the sale of intoxicating liquors is permitted by law, that saloon limits have been provided and certain areas fixed in residence sections of such cities where no saloons can be operated. In addition to this, the law fixes a heavy license for one who would sell liquors, and makes quite ample provision for the keeping of an orderly house, for the prevention of gambling, the visiting of lewd women and the inhibition of selling intoxicating liquors to habitual drunkards, as well as certain closing hours. The public and the State are interested in the fair and reasonable enforcement of such regulatory laws. If, however, we are to permit one, under the guise of keeping a drugstore and under the pretence of selling on prescription, to convert his place of business into a common tippling house where the scarlet women may abide, and where the habitual drunkard and minor may receive a welcome, and no hours are respected, and no safeguards are provided, where the State's revenue is diminished, and where lawlessness would breed, and lawbreakers would find an asylum, infinite damage would be done to the State. It would constitute discrimination and a manifest injustice against the man seeking to do business authorized by law, and under the safeguards and provisions of the law. Such a place might be as destructive to property as building a powder mill next to it, and as injurious to society as anything of which one could easily conceive. Now, can it be said that the State has no interest in preventing such a condition of affairs? Is it to be said that the State can only proceed by criminal prosecutions, and that the strong arm of the law by injunction is to be denied the State in its effort to protect society? It is my view, and such seems to be in accordance with the great weight of authorities everywhere, and the settled policy of this State in all the courts, to proceed against such a man with all the power of all the courts and with a mailed hand that would be sufficient for the due and proper protection of society.

It was, however, urged in argument that under the facts of this case relator was entitled to his discharge. The record shows that, as is usual in such cases, the writ of injunction ran against not only the relator but against his agents, servants and employes enjoining them

from the unlawful sale of liquors in the house and place where he was doing business. The evidence shows that the sale took place in the house, and that such sale was an unlawful sale. There is no suggestion that the sale was made by some one not connected as servant or employe in the house, but because the relator testified and claimed on the hearing that he had no financial interest in the business, but that same belonged to his minor son, it is here contended, as a matter of law, that he is entitled to his discharge. It appears, however, that his son, whom he claims was the owner and proprietor of the business, was a minor. It is shown that relator leased the house. It is shown that he obtained license from the federal government and from the authorities of this State to do business. The business, therefore, was being done under the shelter and sanction of his name and under his authority and with reference to a license issued to him, and not to his son. We can well understand how the court below, acquainted with the parties and familiar with all the facts, might well have rejected as untrue the disclaimer of relator of having any connection with or ownership of the business. It would indeed be a destructive rule of decision to expect this court, in the face of a finding by the court below discrediting the contention of relator of lack of ownership in the business, where all the other facts, leasing the house, obtaining license for the conduct of the business, showed his connection, to overturn and discredit the finding of the trial court. We are not prepared to do this, nor do we think we should do it.

A careful consideration of the motion, which was prepared with the utmost skill and presented and argued with the greatest ability, has convinced us that the original disposition of the case was proper, and that no ground exists why it should be set aside. It is, therefore, ordered that the motion for rehearing be and the same is hereby in all things overruled.

*Overruled.*