STATE v. BIGGS.

(Filed December 18, 1903.)

PHYSICIANS AND SURGEONS—*Licenses—The Code, secs. 3122, 3124—Acts 1903, ch. 697—Constitution of North Carolina, Art. I, secs. 7, 31—Const. U. S., Fourteenth Amendment.*

> Under a special verdict finding that the defendant advertises himself as a non-medical physician, curing disease by a system of drugless healing and treating patients by such system without medicine, claiming not to cure by faith, but by natural methods, without medicine or surgery; and that he administers massage, baths and physical culture, manipulates the muscles, bones, spine and solar plexus, and kneads the muscles with the fingers of the hand, writes no prescriptions as to diet, but advises his patients what to eat and what not to eat, the defendant is not guilty of practicing medicine without license though he admits that he was not licensed to practice medicine by the state medical board; that he charges fees for his services, and does not claim exemption as a nurse, midwife, or as curing by prayer.

INDICTMENT against Andrew C. Biggs, heard by Judge W. R. Allen and a jury, at May Term, 1903, of the Superior Court of GUILFORD County. From a judgment of guilty on a special verdict the defendant appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*C. M. Stedman* and *E. J. Justice,* for the defendant.

CLARK, C. J. The defendant is indicted on a charge that he "did unlawfully and wilfully begin, engage in and continue the practice of medicine and surgery and the branches thereof for fee or reward, without having obtained a license so to do from the Board of Medical Examiners of the State of North Carolina." Upon the facts found the Court was of opinion that the defendant was guilty. The defendant appealed from the judgment imposed.

The special verdict found that the defendant advertised himself as a "non-medical physician"; that he held himself out to the public to cure disease by a "system of drugless healing, and treats patients by said system without medicine, claiming not to cure by faith"; that he advertises to cure by "natural methods," without medicine or surgery. The only acts that he is found by the verdict to have performed are that "he administers massage, baths and physical culture, manipulates the muscles, bones, spine and solar plexus, and kneads the muscles with the fingers of the hand. He writes no prescriptions as to diet, but advises his patients what to eat and what not to eat; all the above treatment is administered to the exclusion of drugs." It was admitted that the defendant was not licensed by the State Medical Board, and claims no exemption under the provisions of the act of 1903, as a nurse or midwife, nor as one curing by prayer, and then there is the important finding that "the defendant charges a fee or reward for his services," and has treated patients by the above treatment and received payment therefor since the passage of chapter 697, Laws 1903, "To define the practice of medicine and surgery."

Section 3124 of The Code requires that every person who applies for license to practice "medicine or surgery or any of the branches thereof," shall stand an examination in "anatomy, physiology, surgery, pathology, medical hygiene, chemistry, pharmacy, *materia medica,* therapeutics, obstetrics and the practice of medicine." There was added by chapter 117, Laws 1885, the following provision: "And any person who shall begin the practice of medicine or surgery in this State for fee or reward, after the passage of this act, without first having obtained license from said Board of Examiners (meaning the State Board of Medical Examiners) shall not be entitled to sue for or recover before any court any medical bill for services rendered in the practice of medicine or sur-

gery or any of the branches thereof, but shall also be guilty of a misdemeanor and upon conviction thereof shall be fined not less than $25 nor more than one hundred dollars or imprisoned at the discretion of the Court for each and every offense."

The constitutionality of this last act has been vigorously assailed in the courts on the ground that every one had an "inalienable right to life, liberty and the pursuit of happiness," as our great Declaration phrases it, and that by that guarantee it is the right of every one to earn his livelihood by pursuing any calling or vocation not unlawful, and that to place his liberty to do so within the power of a committee chosen by those already pursuing any given calling would be to infringe upon section 7, Article I of our State Constitution, which forbids exclusive privileges and emoluments to any set of men, and section 31 of the same article, which prohibits "monopolies and perpetuities." Of late years there has been added the argument that such act is also obnoxious to the Fourteenth Amendment to the Constitution of the United States, which prohibits any State "to deny to any person the equal protection of the law."

There was undeniably great force in the argument on that side. The law-making power slowly in this State and in others yielded to the view that it could or should pass such act. In 1858-'59, chapter 258, it first incorporated "The State Medical Society," and authorized the above examination, and prohibited any one to practice medicine or surgery or prescribe for the cure of diseases for fee or reward without such license, but was careful to add a proviso that no one who should practice without such license should be guilty of a misdemeanor, the only penalty being that if he practiced on credit he could not recover his fees in the courts. The law remained thus till the above-recited act, passed in 1885, and which was made prospective. The constitutionality of this

last statute was fully considered, and after a most able argument against it by counsel was sustained by this Court, but not without great hesitation, and upon the ground solely that the act was "an exercise of the police power for the protection of the public against incompetents and imposters, and in no sense the creation of a monopoly or special privilege." *S. v. Call,* 121 N. C., 646. If the object of the act could be construed as intended to give special and exclusive privileges to a special body of men, and not solely and in truth for the protection of the public, the Legislature was prohibited by the Constitution from enacting it, nor could the Legislature restrict the cure of the body to the practice of "medicine and surgery," or establish any State system of healing. *State v. McKnight,* 131 N. C., 723.

After these decisions moderation and wisdom would have suggested that the matter rest. Those who wish to be treated by practitioners of medicine and surgery had the guarantee that such practitioners had been duly examined and found competent by a board of gentlemen eminent in that high and honorable profession, and those who had faith in treatment by methods not included in the "practice of medicine and surgery," as usually understood, had reserved to them the right to practice their faith and be treated if they chose by those who openly and avowedly did not use either surgery or drugs in the treatment of diseases. The courts have declared that they possessed this right, and that the Legislature could not, under the Constitution, restrict all healing to any one school of thought or practice. What is "the practice of medicine and surgery" is as well understood, and its limits, as the practice of dentistry. The courts have also held that of the many schools of "medicine and surgery" the Legislature could not prescribe that any one was orthodox and the others heterodox, but that those professing the different systems—"allopathic," "homeopathic," "Thompsonian" and the like—should be ex-

STATE *v.* BIGGS.

amined upon a course, such as is taught in the best colleges of that school of practice, but that it is not essential that a member of each, or of any special school, should be upon the Board of Examiners.

At the last session of the General Assembly the following act (1903, ch. 697), was passed amendatory of section 3122 of The Code: "For the purpose of this act the expression 'practice of medicine and surgery' shall be construed to mean the management for fee or reward of any case of disease, physical or mental, real or imaginary, with or without drugs, surgical operation, surgical or mechanical appliances, or by any other method whatsoever; provided that this shall not apply to midwives nor to nurses; provided further, that applicants not belonging to the regular school of medicine shall not be required to stand an examination except upon the branches taught in their regular colleges, to-wit, the osteopaths, shall be examined only upon descriptive anatomy, general chemistry, histology, physiology, urinalysis and toxicology, hygiene, regional anatomy, pathology, neurology, surgery, applied anatomy, bacteriology, gynecology, obstetrics and physical diagnosis; provided this act shall not apply to any person who ministers to or cures the sick or suffering by prayer to Almighty God, without the use of any drug or material means."

*Chief Justice Pearson* in *McAden v. Jenkins,* 64 N. C., 801, noted, as of common knowledge, and reiterated in *Railroad v. Jenkins,* 68 N. C., 505, that railroad charters are drafted by "promoters," and hence should be construed most strongly against the grantees and in the interest of the public. Though there may be no promoters here, the same rule applies to this act amending the charter of this corporation, in whose supposed interests it was evidently drafted, and not solely in the interest of the public. Under the guise of "construction" of those well-understood terms, the "practice of medicine and sur-

gery," the act essays to provide that the expression "practice of medicine and surgery shall be construed to mean the management 'for fee or reward' of any case of disease, physical or mental, real or imaginary, with or *without drugs, surgical operation, surgical or mechanical appliances, or by any other method whatsoever."* That is, the practice of surgery and medicine shall mean practice without surgery or medicine if a fee is charged. If no fee is charged, then the words "surgery and medicine" drop back to their usual and ordinary meaning, as by long usage known and accustomed. Where, then, is the protection to the public, if such treatment is valid when done without fee or reward? Yet, unless the act confers, and is intended solely to confer, protection upon the public, it is invalid. The Legislature cannot forbid one man to practice a calling or profession for the benefit or profit of another.

Again, the act means more than its friends probably intended, for it says: "Any case of disease, physical or mental, real or imaginary." Is not a disease of the eye physical, and is not a disease of the ear, or of the teeth, or a headache, or a corn, physical? Then every dentist and aurist and oculist is indictable unless he has also license from the State Medical Society as an M. D., as is also every corn doctor who relieves aching feet, and every peripatetic of stentorian lungs on the court-house square who banishes headache, real or imaginary, by rubbing his hands over some credulous brow. He, too, must be an M. D. Then there is the closing expression forbidding treatment "for fee or reward" by other than an M. D., "by any other method whatsoever." This would take in all the old women and the herb doctors, who, without pretending to be professional nurses, relieve much human suffering, "real or imaginary," for a small compensation. Then it is forbidden to relieve a case of suffering, "physical or mental," in any method unless one is an M. D.

It is not even admissible to "minister to a mind diseased" in any method or even dissipate an attack of the "blues" without that label duly certified. Is not this creating a monopoly and the worst of monopolies that diseases shall not be cured or alleviated, whether real or imaginary, mental or physical, though without medicine or surgery, "if for a fee," unless one has undergone an examination on "anatomy, physiology, surgery, pathology, medical hygiene, chemistry, pharmacy, *materia medica,* therapeutics, obstetrics and the practice of medicine"? Such examination is eminently proper for one who holds himself out as an M. D., and those who wish to employ an M. D. should certainly have the guarantee that is given by his license that the M. D. is competent. But how about those who are too poor or too ignorant or too perverse to wish that kind of treatment? Is it requisite that the man who treats a diseased ear shall really be competent in obstetrics, or that it is a penalty to treat a disease of the eye unless the operator understands chemistry, or that it is indictable in this State to remove corns or to plug teeth without full knowledge of the *materia medica,* or to banish headache by the application of the hands without having passed a satisfactory examination on anatomy, or to apply a fomentation without being able to "pass up" on therapeutics, or to sell a little herb tea for the stomach-ache without being scientifically versed in pathology and physiology? The act is too sweeping. Besides, the Legislature could no more enact that the "practice of medicine and surgery" shall mean "practice without medicine and surgery" than it could provide that "two and two make five," because it cannot change a physical fact. And when it forbade all treatment of all diseases, mental or physical, without surgery or medicine, or by any other method, for a fee or reward, except by an M. D., it attempted to confer a monopoly on that method of treatment, and this is forbidden by the Constitution.

Our early legislation naturally gave physicians no special privileges, but it was directed solely to fixing a limitation upon their charges and providing penalties for malpractice. Were a monopoly of all treatment of diseases conferred upon M. D.'s it would necessarily follow that the Legislature would have to prescribe their scale of charges again. That matter could not, with due regard to the public interest, be left to a monopoly. The medical profession merited and obtained a due share of prosperity prior to above statute of 1903 and will receive no great detriment because the defendant cannot be punished under its provisions.

Those not M. D.'s contend that the allopathic system of practice is contrary to the discoveries of science and injurious to the public. Some M. D.'s doubtless believe that all treatment of disease except by their own system is quackery. Is this point to be decided by the M. D.'s themselves through an examining committee of five of their own number, or is the public the tribunal to decide by employing whom each man prefers, whether allopath, homeopath, osteopath or the defendant? The law says that the M. D.'s may examine and certify whether an applicant is competent to be one of their number, and no one can practice medicine and surgery without it, but they cannot decide for mankind that their own system of healing is now and ever shall be the only correct one and that all others are to be repressed by the strong arm of the law. This act admits Christian Scientists to practice to cure diseases without such examination. By what process of reasoning can massage, baths and the defendant be excluded? In the cure of bodies, as in the cure of souls, "orthodoxy is my doxy, heterodoxy is the other man's doxy," as Bishop Warburton well says. This is a free country, and any man has a right to be treated by any system he chooses. The law cannot decide that any one system shall be the system he shall use. If he gets improper treatment for children or others

under his care, whereby they are injured, he is liable to punishment, but whether it was proper treatment or not is a matter of fact to be settled by a jury of his peers and not a matter of law to be decided by a judge nor prescribed beforehand by an act of the Legislature.

The practice of medicine and surgery, in the usual and ordinary meaning of that term, is of the highest antiquity and dignity.   In the Code of Hammurabi, King of Babylon, fifteen centuries older than The Code of Moses, and which, engraved on a column of black diorite, was but recently dug up at Susa in ancient Elam, there are found (sections 215-225) regulations of the medical profession, fixing a scale of fees and penalties for malpractice.   Physicians are mentioned in both the Old and New Testaments.   Jeremiah asks: "Is there no balm in Gilead?   Is there no physician there?"   The public have a right to know that those holding themselves out as members of that ancient and honorable profession are competent and duly licensed as such.   The Legislature can exert its police power to that end, because it is a profession whose practice requires the highest skill and learning.   But there are methods of treatment which do not require much skill and learning, if any.   Patients have a right to use such methods if they wish, and the attempt to require an examination of the character above recited for the application of such treatment is not warranted by any legitimate exercise of the police power.   The effect would be to prohibit to those who wish it those cheap and simple remedies, and deprive those who practice them of their humble gains, by either giving a monopoly of such remedies to those who have the title of M. D., or prohibiting the use of such remedies altogether, neither of which results the Legislature could have contemplated, and both of which are forbidden by the provisions of the Constitution above cited.

133—47.

In this case the defendant is found guilty of the following acts, and no more:

(1) Administering massage, baths and physical culture.

(2) Manipulating muscles, bones, spine and solar plexus.

(3) Kneading the muscles with the fingers of the hand.

(4) Advising his patients what to eat and what not.

And all this without prescriptions, without any drugs or surgery. These acts, by the terms of the statute, are harmless and not indictable "unless done for fee or reward." There is nothing in this treatment that calls for an exercise of the police power by way of an examination by a learned board in obstetrics, therapeutics, *materia medica* and the other things, a knowledge of which is so properly required for one who would serve the public faithfully and honorably as a doctor of medicine.

It is not only in the scope of the police power for the State to regulate the "practice of medicine and surgery" and to throw around the public any reasonable protection against unfit members of that honorable profession and provide against malpractice, but the General Assembly can prohibit any pretended art of healing which is calculated to deceive and injure the public. It is also within its power to protect the public against the ignorant and vicious who profess knowledge and skill in any art or profession of healing in which technical knowledge and learning are required to safely and properly practice it. But it is not found here that the defendant is deceiving and injuring the public or is ignorant and incompetent, to the detriment of the public, in the application of the methods he uses. It may be that if he were not there some of the patients might call in an M. D., but that is due possibly to the ignorance or perversity of the patients who may prefer the defendant's methods and scale of fees. The police power does not extend to such cases.

The law is thus stated in *Lawton v. Steele,* 152 U. S., pp.

137, 138: "The Legislature may not, under the guise of protecting public interests, arbitrarily interfere with private business or impose unusual or unnecessary restrictions upon lawful occupations. In other words, its determination of what is a proper exercise of its police power is not final or conclusive, but is subject to the supervision of the courts." After citing cases, it is said, on page 138: "In all those cases the acts were held to be invalid as involving an unnecessary invasion of the rights of property and a practical inhibition of certain occupations harmless in themselves and which might be carried on without detriment to the public interests." See also *State v. Pendergrass,* 106 N. C., 667; *Ohio v. Gardner,* 58 Ohio St., 599, 41 L. R. A., 689.

License is required for the practice of pharmacy, of dentistry, of law and many other skilled professions. We have a State system of law, for the "Law is the State," and laws are prescribed by the Legislature, and we also have a State system of education, yet it is not indictable for one not a lawyer to draw wills, deeds, bills of sale or any other legal instrument whatever, nor is it made punishable to settle litigation out of court by arbitration or otherwise without the aid of a lawyer, nor to teach in other than the State schools. Though there are many methods of treating disease, among which the Legislature is not authorized to select one as the State system, excluding all others, yet this act, if valid, would make it punishable by law to charge a fee for treatment of "any disease, real or imaginary, mental or physical, by any method whatever," unless the party has been admitted by a committee from one school of treatment upon examination of that system, thus denying mankind any relief from pain and suffering except at the hands of that particular school of medical thought. It may be, and probably is, the best system. But that is a matter which must be decided by those who seek and must pay for the relief—not by the M. D.'s themselves

nor by the courts. Judges are lawyers and are not competent to decide, except for themselves as individuals, which is the best system of treatment, and those practitioners who eschew medicine and surgery may well object to leaving the question whether "medicine and surgery" is the only permissible method of treatment to be decided by the practitioners of that method.

The defendant is not charged nor shown to be an osteopath, and disclaims being one. His learned counsel contends that the act of 1903, ch. 697, is further unconstitutional because of the following (quoted from his brief): "There is no provision for the examination of any but allopaths and osteopaths. It provides that all persons, except midwives, nurses and those who profess to heal by prayer, who minister to the sick for fee or reward 'by any other method whatsoever,' shall be construed to be practicing medicine or surgery, and then follows this language: 'Provided further, that applicants not belonging to the regular school of medicine shall not be required to stand an examination except upon the branches taught in their regular colleges, to-wit, the osteopaths shall be examined only upon descriptive anatomy, general chemistry, histology, physiology, urinalysis and toxicology, hygiene, regional anatomy, pathology, neurology, surgery, applied anatomy, bacteriology, gynecology, obstetrics and physical diagnosis.' The osteopath is required to stand an examination in surgery and every other branch that those belonging to the regular school of medicine are required to be examined in, except pharmacy, *materia medica*, therapeutics and the practice of medicine, and in addition he is required to stand an examination in branches that the regular medical student is not required to be examined on, as follows: 'histology, urinalysis and toxicology, regional anatomy, neurology, bacteriology, gynecology and physical diagnosis.' But it is remarkable that he is not required to

pass examination in the branches that his profession recognizes and teaches to be of special importance in the practice of osteopathy, such as principles of osteopathy, osteopathic manipulations and osteopathic diagnosis."

As his client is not an osteopath, we are not called upon in this case to pass upon the alleged discrimination against osteopaths in the prescribed course of study. But if it be objected that we have only shown that the defendant's practice did not call for the examination required, as above set out, for an allopath, it may be as well to say that the acts of which he was convicted of doing "for a fee," to-wit, using massage, baths, physical culture, manipulating muscles, bone, spine and solar plexus, and advising his patients as to diet, could be done as safely to the public, so far as shown, without an examination on "histology, urinalysis and toxicology, bacteriology, neurology and gynecology," which are some of the things added to the course by the aforesaid act, for the comfort and convenience of those wishing to obtain license to practice osteopathy, and of course only to protect the public against incompetents in that line of practice.

It is possible, however, that an expert knowledge of gynecology is not essential in administering baths, and there is room for serious doubt whether bacteriology and toxicology are connected with massage in any way.

The term "practice of medicine and surgery" embraces probably the larger and certainly by far the most profitable part of the "treatment of diseases," but is not co-extensive with the latter term and cannot be made so unless "surgery and medicine" are adopted as the State system of treatment, a monopoly, and all other methods are made indictable. On the other hand, the State Medical Society would hardly wish to broaden out so as to take in all methods of treatment of diseases, for this would be to take in practitioners and practices which they would not wish to recognize. All the law

so far has done or can do is to require that those practicing on the sick with knife and drugs shall be examined and found competent by those "of like faith and order." Doctor Oliver Wendell Holmes, in an address before the Medical Society in Massachusetts, said: "If the whole *materia medica* was sunk to the bottom of the sea it would be all the better for mankind and all the worse for the fishes." An eminent medical authority in this State has said that out of twenty-four serious cases of disease three could not be cured by the best remedies, three others might be benefited, and the rest would get well anyway. Stronger statements could be cited from the most eminent medical authorities the world has known. Medicine is an experimental, not an exact, science. All the law can do is to regulate and safeguard the use of powerful and dangerous remedies, like the knife and drugs, but it cannot forbid dispensing with them. When the Master, who was Himself called the Good Physician, was told that other than His followers were casting out devils and curing diseases, He said: "Forbid them not."

Upon the special verdict the defendant should be adjudged not guilty.

Reversed.

WALKER and CONNOR, JJ., concur in result.