### JOHNSON v. STATE.　(No. 9468.)

(Court of Civil Appeals of Texas. Dallas.
Dec. 6, 1924. Rehearing Denied
Jan. 17, 1925.)

**1. Injunction ⬅️111—"Residence" for purpose of practicing medicine gave district court jurisdiction in suit to restrain unlawful practice; "domicile."**

In view of Rev. St. art. 5744b, as added by Acts 38th Leg. (1923) c. 138, § 6, where defendant had acquired residence in H. county for purpose of practicing his profession, it gave district court of that county venue in suit to restrain him from unlawfully practicing medicine within state though his domicile was in another county; "domicile," within venue statutes, meaning "residence," which requires only bodily presence, as distinguished from "domicile," requiring both residence in place and intent to make it one's home.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Domicile; Residence.]

**2. Injunction ⬅️127—Evidence in injunction suit as to defendant's treatment of patients previous to conviction held admissible.**

In suit under Rev. St. art. 5744b, as added by Acts 38th Leg. (1923) c. 138, § 6, to restrain unlawful practice of medicine, evidence as to defendant's treatment of patients previous to his conviction of violation of Medicine Practice Act was admissible, though article 5744b prohibits injunction until after a conviction.

**3. Injunction ⬅️111—Suit properly brought in county of defendant's "residence"; "domicile."**

In view of construction of "domicile" as used in Rev. St. art. 1830, "domicile," within article 4653, providing that certain writs of injunction shall be returned and tried in county of defendant's domicile, means "residence."

**4. Physicians and surgeons ⬅️2—Medical Practice Act held not unconstitutional.**

Medical Practice Act, as amended by Acts 38th Leg. (1923) c. 138, held not unconstitutional as discriminating against recognized schools or systems of healing; conditions prescribed by sections 3 and 4, amending articles 5739, 5741, Rev. St., as prerequisites in education and training for entry into medical profession, applying to all persons alike.

**5. Evidence ⬅️19—Common knowledge that few professions require more careful preparation to enter it than does medicine.**

It is matter of common knowledge that few, if any, professions require more careful preparation by one who seeks to enter it than does that of medicine.

**6. Jury ⬅️14(11)—Act providing for suit to restrain unlawful practice of medicine held not invalid as denial of jury trial.**

Rev. St. art. 5744b, as added by Acts 38th Leg. (1923) c. 138, § 6, providing that state may sue to restrain unlawful practice of medicine, *held* not invalid as denial of right to jury trial, in view of such right in equity cases; jury trial for contempt for violation of injunction not being matter of right.

**7. Equity ⬅️1—Legislature may change boundaries of equity jurisprudence and regulate practice if no constitutional rights are destroyed or invaded.**

Legislature has power to change boundaries of equity jurisprudence and regulate practice, provided legislation does not destroy or invade constitutional right.

**8. Injunction ⬅️130 — Directed verdict for state in suit to enjoin practice of medicine held proper.**

In suit by state to enjoin defendant from unlawfully practicing medicine, where evidence was undisputed and established fact that defendant was practicing in violation of law and had theretofore been convicted, directed verdict for state was proper.

Vaughan, J., dissenting.

Appeal from District Court, Hunt County; Newman Phillips, Judge.

Suit by the State against W. L. Johnson. Judgment for plaintiff, and defendant appeals. Affirmed.

Thos. W. Thompson and Neyland & Neyland, all of Greenville, for appellant.

J. W. Bassett, of Greenville, R. K. Hanger, of Fort Worth, W. A. Keeling, Atty. Gen., and Clark & Clark, of Greenville, for the State.

JONES, C. J. This is a suit brought in the district court of Hunt county, Tex., by the state of Texas, represented by W. A. Keeling, Attorney General of Texas, Jas. W. Bassett, county attorney of Hunt county, and R. K. Hanger, district attorney of Tarrant county, seeking an injunction to restrain W. L. Johnson, appellant, from unlawfully practicing medicine and from pursuing such occupation in this state. The case was tried before a jury, and at the conclusion of the evidence the court instructed a verdict in favor of appellee, and a judgment was duly entered which enjoined and restrained appellant from in any way practicing medicine in violation of the provisions of title 90, ch. 1, of the Revised Statutes of Texas, or in violation of the provisions of title 12, ch. 6, of the Penal Code of Texas; and also enjoined and restrained appellant from thereafter, in any way, treating or offering to treat any disease or disorder, mental or

physical, or any physical deformity or injury, by any system or method, or to effect cures therefor, for money or other compensation within this state.

Appellant has duly perfected his appeal to this court and seeks a reversal of this case on the grounds: (1) The overruling of his plea of privilege to be sued in Tarrant county, alleged to be his residence; (2) for the admission of evidence, both showing and tending to show the practice of his profession in Hunt county previous to the date of his conviction of the statutory crime of practicing medicine in said county without a license to do so; (3) a reversal and rendering of this cause in his favor because the Medical Practice Act of this state in many of its essential features is unconstitutional and therefore void; (4) article 5744b, which provides for the procedure had in this case, and which was added by amendment to title 90, ch. 1, of the Revised Statutes of this state by the Thirty-Eighth Legislature (Acts 1923, c. 138, § 6), is unconstitutional and void. The specific ground on which the constitutionality of the above enactments is assailed will be specifically stated as same are herein reviewed.

The undisputed evidence of this case is that appellant, previous to June 11, 1924, the day on which this judgment was entered, had practiced his profession and, by numerous advertisements, had held himself out as a practitioner of such profession in Hunt county for a period of approximately eight months; that during this time he had an office in a building in the city of Greenville, in every way properly fitted and equipped for such practice; that previous to his locating in Greenville he had practiced his profession as a chiropractor in the city of Fort Worth, Tex., for about four years; that he is a married man, his family consisting of himself, wife, and several children; that he did not own any property in Fort Worth and, after locating at Greenville, he maintained no office in Fort Worth and did not hold himself out in said city for the practice of his profession; that he had established his home in Fort Worth when he located there and voted in the city of Fort Worth; that his family still resided in the city of Fort Worth, and he had no present intention of removing his said family to Greenville; that when he ceased practicing his profession in Fort Worth he did so with the intention of securing another location, but the place for a permanent location had not been determined; that if he should decide to leave Greenville, it is problematical whether he would return to Fort Worth or seek a new location; that his practice in Greenville had been fairly satisfactory and that his intention was to remain in Greenville as long as it was fairly satisfactory; that he owned an automobile and kept same in Greenville; that during the time he had been in Greenville he had a room at the Commercial Hotel, which he occupied at night and at other times when he was not engaged in his office or in recreation; that during his stay in Greenville he would leave his home on Monday morning at about 6 a. m. and arrive in the city of Greenville about 10 a. m. of said day, and remain in Greenville in the practice of his profession until 5 p. m. on Saturday afternoon, when he would leave for Fort Worth, returning again the following Monday morning; that on the 4th day of March, 1924, he was duly tried and convicted on information filed in the county court of Hunt county charging him with practicing medicine in violation of law as such an offense is defined by chapter 6, tit. 12, of the Penal Code of this state; that a judgment was entered in this case assessing his punishment at a fine of $100 and one day confinement in the county jail, and that such judgment had been fully satisfied by him; that he was pursuing his profession of chiropractor in Hunt county at the time of the trial of this case without having complied with the Medical Practice Act.

Appellant filed his plea of privilege to be sued in Tarrant county, and an issue on same was duly made by appellee's controverting plea. The petition for injunction alleged that appellant resided both in Tarrant and Hunt counties.

[1] Did the court err in overruling the plea of privilege? The specific contention of appellant on this issue is that in this suit it is the domicile of appellant, as distinguished from his residence, that determines the venue of this suit; that a person can have but one domicile, and, when that is once fixed, it remains until it is changed by the establishment of another; that regardless of his residence in Hunt county, appellant's domicile was in the city of Fort Worth, Tarrant county; and that this was not affected by his intent in the future to select another domicile. It is true, in the strict significance of the term, a person can have but one domicile, and if appellant is correct in his assumption that domicile, as distinguished from residence, controls the venue of this suit, then this case should be reversed and transferred to Tarrant county, for such county is undoubtedly his "domicile" if that word is given its strict meaning. Our venue statutes sometimes use the word "domicile" and sometimes use the word "residence," for which reason our courts have denied to the word "domicile" its strict meaning, and given it the meaning of "residence" in such statutes. Pearson v. West, 97 Tex. 238, 77 S. W. 944; Taylor v. Wilson, 99 Tex. 651, 93 S. W. 109; Latham v. Continental Supply Co. (Tex. Civ. App.) 230 S. W. 230; Wrenn v. Brooks (Tex. Civ. App.) 257 S. W. 299; Littlefield v. Clayton (Tex. Civ. App.) 194 S. W. 194; Armstrong v. King (Tex. Civ. App.) 130 S. W. 629; Funk v. Walker (Tex. Civ. App.) 241 S. W. 720.

These cases establish the proposition that

under the venue statutes of this state a person may have more than one legal residence, and that such person cannot plead his privilege if sued in a county where he had established one of these residences. Residence requires only bodily presence as an inhabitant in a given place, while "domicile," in its strict sense, requires residence in that place together with an intention to make it the home. The evidence on the plea of privilege establishes that appellant was an inhabitant of the city of Greenville and had established a residence there for the purpose of pursuing his profession. This fixes such a residence of appellant in Hunt county as gives the district court of that county venue of this suit.

In addition to these decisions construing the word "domicile" as used in the venue law, said article 5744b is strongly suggestive that the intention of the Legislature was that the venue of the injunction suit authorized by its provisions should be in the county in which the defendant resides for the purpose of unlawfully practicing medicine, in that it provides that the suit may be instituted by the district attorney of the county in which the defendant resides, or the county attorney of the county in which he resides, and this suit was instituted in such county and by the officials so designated. The assignments of error on the issue of venue of the suit are overruled.

[2] The article of the statute in question provides that the suit for injunction shall not be entertained in advance of the previous final conviction of the defendant in the injunction suit of a violation of the Medical Practice Act, as such offense is defined by title 12, ch. 6, of the Penal Code. In the trial of the cause evidence was admitted, over the timely objection of appellant, as to his treatment of patients for pay previous to such conviction, and this action of the court is assigned as error on the theory that under such act no evidence of unlawful acts and conduct of appellant previous to the conviction was admissible. We do not so construe the effect of that provision of said statute. This provision of the statute is enacted as a safeguard in behalf of the defendant against whom the injunction provision of the statute is invoked. Its effect is to render a person immune from the drastic provision of the injunction feature of the said act until it has been established beyond a reasonable doubt, in a court of competent jurisdiction, that the defendant is unlawfully engaged in the practice of medicine. It is not, therefore, a limitation on the state in the matter of evidence. The assignment of error in reference to the admission of such evidence is overruled.

[3] It is also urged that, as article 4653 of our Revised Statutes provides that writs of injunction for causes other than to stay proceedings in a suit, or executions on a judgment, shall be returned and tried in the proper court of the county of defendant's domicile, and as the evidence disclosed that defendant's domicile was in Tarrant county and not in Hunt county, the district court of Hunt county was without jurisdiction to try said cause. We see no reason why the word "domicile," used in said article 4653, should be given a different meaning to the word "domicile" used in article 1830 of the general venue statute. Said article 1830 reads:

"No person who is an inhabitant of this state shall be sued out of the county in which he has his domicile, except in the following cases."

Then follows the well-known exceptions to the venue statute.

In the case of Pearson v. West, supra, the Supreme Court construed the word "domicile" as used in article 1830. This was a suit by the plaintiff against the defendant for damages for an alleged assault committed upon plaintiff in Live Oak county, Tex. The suit was filed in the district court of Bexar county. Defendant contested the right of plaintiff to institute the said suit in Bexar county, and filed a plea in abatement, alleging his residence to be in Live Oak county and not in Bexar county. The undisputed evidence showed that defendant owned a large ranch in Live Oak county, moved his family on said ranch in a suitable residence, and established his domicile there with no intention of any future change in respect thereto; that they had resided in the Live Oak county home for a number of years; that defendant voted therein, and always claimed it as his place of residence; that for some years previous to the suit defendant and his wife would live about one-half of the year in the city of San Antonio, Bexar county, but would return to Live Oak county and live on his ranch during the remainder of the year. During all these years of his divided residence he had fixed Live Oak county as his domicile; that he purchased a residence in San Antonio and, when he and his wife lived in said city, they occupied this residence. In a very able and lengthy discussion of the meaning of the term "domicile," as used in the general venue statute, the Supreme Court, speaking through Judge Brown, held that the words "domicile" and "residence" had been used by the Legislature interchangeably and construed said venue statute as if it read: "No person who is an inhabitant of this state shall be sued out of the county in which he has his residence." That decision held that the defendant West had two residences within the state in which venue of a suit against him could be properly laid and sustained the venue of the suit in Bexar county.

The reason urged by the Supreme Court in Pearson v. West, supra, and the construction there given the word "domicile" as used in article 1830, are as applicable to said

word when it is used in article 4653, and we adopt such construction. The assignments of error raising this question are overruled.

[4] It is urged that title 90, ch. 1, of the Revised Statutes, and title 12, ch. 6, of the Penal Code, as amended by chapter 138 of the Thirty-Eighth Legislature of Texas, are unconstitutional and void. This contention is not based on the theory that the state, in the exercise of its legitimate police power, cannot enact reasonable regulatory legis-lation in reference to those who engage in the practice of medicine in any form, but is based on the theory that the said legislative enactments are so framed in their terms as to exclude appellant and others who treat diseases on the chiropractic theory from such profession, and therefore discriminate between individuals seeking to follow the same profession. The logic of appellant's contention is that, as the various schools established by the different systems of the practice of medicine to qualify one for the treatment of disease and human deformity are based on radically different theories, both as to the cause of said ills and as to their treatment, manifestly there can be prescribed by the Legislature no general or common educational test to determine the fitness of one to practice his own system of the "healing art." Instead of the one common test as prescribed by the Medical Practice Act, the Legislature "must provide for an education and examination appropriate to the particular school," in order that such legislation will not fall within the constitutional inhibition against discrimination.

Articles 5739 and 5741 of the Revised Statutes, which are a part of the Medical Practice Act, it is urged, are specially subject to this criticism. The first of these articles provides that all applicants for license to practice medicine in this state, not otherwise licensed under the provisions of law, must successfully pass an examination before the board of medical examiners. It also provides that before any one can be eligible for this examination, he must present, among other things, satisfactory evidence to the board of examiners that he is a graduate of a bona fide reputable medical school; that no school can be considered reputable within the meaning of this law unless its entrance requirements and courses of instructions are as high as those adopted by the better class of medical schools of the United States whose course of instruction shall embrace not less than four terms of eight months each. The second of these articles provides that the examination shall be conducted by the medical examining board on the subjects of anatomy, physiology, chemistry, histology, pathology, bacteriology, diagnosis, surgery, obstetrics, gynecology, hygiene, and medical jurisprudence. It is contended that article 5739 discriminates against the chiropractic college and against the graduate of such college practicing its system of healing, for the reason that it appears from the record of this case that the course of the standard school of the chiropractic extends over three years of six months each, and hence does not meet the requirement of the law and cannot be denominated a bona fide reputable medical school, and that, notwithstanding how proficient the graduate of a chiropractic school may be in the practice of his system of healing, he is barred from the medical examination and is forbidden a license to pursue his profession; that the chiropractic practitioner only practices in a special branch of healing, and his school thoroughly prepares him for this particular field; that such practitioners do not practice gynecology, obstetrics, or surgery, and make no chemical examinations, and the long and extended course of study required for practice of regular medicine are not necessary or of any value to the chiropractor. The conclusion is therefore made that, as the school of the chiropractor is sufficient in all of its requirements thoroughly to prepare the student for this special branch of healing, the right to have legislative recognition of this fact is undoubted, and, as such recognition is denied by these statutes, they are discriminatory and void.

Appellant clearly and succinctly states his position in this respect as follows:

The Legislature, in the exercise of its police power in regulating the practice of medicine in this state, (1) "must not forbid the practice of any particular school of healing, provided it be shown that this school is a recognized school or system of healing; (2) it must provide for an education and examination appropriate to the particular school, and not simply appropriate to and fitted for some other school of healing; (3) it must not discriminate between the different schools in any manner whatsoever."

[5] The vice that runs through the above propositions is that it assumes that the Legislature entered a broader field in its exercise of police power than the enactments in question indicate. The Legislature did not by its enactment of the Medical Practice Act forbid the practice of any recognized school or system of healing. Neither did it assume to provide for an education and examination appropriate to any particular school, nor did it discriminate between different schools of medicine. If the Legislature had entered such broader field and directed the entire course of study and technical training for one to take before he should be permitted to practice medicine, then its legislation would have to conform to the above-announced principles. In the interest of the public health and the general welfare of the people, the Legislature is authorized to prescribe such regulations

to be conformed to by persons seeking to enter the practice of medicine as in its judgment will secure, or tend to secure, the people against the consequences of ignorance and incapacity, as well as of deception and fraud, and this without regard to any special system of practice or any established school of medicine. It is a matter of common knowledge that few, if any, professions require more careful preparation by one who seeks to enter it than does that of medicine. It deals with all those subtle and mysterious influences upon which health and life depend. Regardless of the school of medicine or system of practice followed by the practitioner of medicine in any of these systems, the general welfare of the people demands that such practitioner be able to detect, readily, the presence of disease, and to treat it in some manner recognized as appropriate for its removal. In order that assurance may be had that the one who treats diseases has this requisite qualification, the state has the undoubted right to prescribe a general preparation to be made by one entering such profession, and also to prescribe that he shall have a knowledge of what the Legislature may deem the necessary scientific branches of such profession.

The conditions prescribed as necessary prerequisites in the matter of education and training for entry into the medical profession by articles 5739 and 5741 represent that which the Legislature in its wisdom deemed necessary in the interest of the public health and the public welfare as the state's guaranty of fitness for this high calling. These conditions apply to all persons alike; they do not prescribe any method to be employed in healing disease, or any system of practice to be adopted by the practitioner. If he possesses the qualifications prescribed by the statutes and is awarded a certificate to practice medicine, he is just as free to adopt the system of the chiropractor as he he is to adopt the system of the regular physician. The fact that it requires a broader education than is given by the chiropractic college to meet these conditions cannot be urged as a discrimination against such schools of medicine. It is easily within the power of a chiropractor to conform to the prescribed conditions. This record shows that all the subjects prescribed by this act for examination are taught by the chiropractic schools, except those of surgery and medical jurisprudence; so it may be said that these schools give substantial recognition to the essential qualifications prescribed by these statutes.

All of the assignments of error attacking the constitutionality of this legislation are overruled. Collins v. Texas, 223 U. S. 288, 32 S. Ct. 286, 56 L. Ed. 439; 21 R. C. L. 354, 355; Hicks v. State, 88 Tex. Cr. R. 438, 227 S. W. 302; Less v. State, 93 Tex. Cr. R. 154, 246 S. W. 382; Black v. State, 86 Tex. Cr. R. 253, 216 S. W. 181; Denton v. State, 83 Tex. Cr. R. 67, 201 S. W. 183; Milling v. State, 67 Tex. Cr. R. 551, 150 S. W. 434; Maier v. State, 90 Tex. Cr. R. 459, 235 S. W. 576; Dowdell v. McBride, 92 Tex. 239, 47 S. W. 524.

[6] The injunction proceedings in the instant case were instituted under the provisions of article 5744b of the Revised Statutes, which article was added by amendment by the Thirty-Eighth Legislature to title 90, ch. 1, of the Revised Statutes. This aritcle reads as follows:

"The actual practice of medicine in violation of any of the provisions of title ninety (90), chapter one (1) of the Revised Civil Statutes of this state, or in violation of the provisions of title twelve (12), chapter six (6) of the Penal Code of this state, shall be enjoined at the suit of the state, but such suit for injunction shall not be entertained in advance of the previous final conviction of the party sought to be enjoined, of the violation of the provisions of title 12, chapter 6, of the Penal Code of this state. In suits for injunction so authorized by this act, it shall not be necessary to show that any person or citizen is personally injured by the acts complained of. Any person who may be so unlawfully practicing medicine in this state, or who may be about to so unlawfully practice medicine in this state, may be made a party defendant in such suit. The Attorney General, the district attorney of the district in which the defendant resides (the county attorney of the county in which the defendant resides), or any of them, shall have the authority, and it shall be their duty, and the duty of each of them, to represent the state in such suits for injunction. No injunction either temporary or permanent, shall be granted by any court, until after a hearing on complaint is had by a court of competent jurisdiction on its merits.

"In such suit no injunction or restraining order shall be issued until final trial and final judgment on the merits of the suit. If on the final trial it be shown that the defendant in such suit has been unlawfully practicing medicine, or is about to practice medicine unlawfully, the court shall by judgment perpetually enjoin the defendant from practicing or continuing the practice of medicine in violation of law as complained of in said suit. Disobedience of said injunction shall subject the defendant to the pains and penalties provided by law for the violation of an injunction. The procedure in such cases shall be the same as in any other injunction suit as nearly as may be. The remedy by injunction giving (given) hereby shall be in addition to criminal prosecution under the penal statutes of this state. Such causes shall be advanced for trial on the docket of the trial court, and shall be advanced and tried in the appellate courts in the same manner and under the same laws and regulations as other suits for injunction." Acts 1923, c. 138, § 6.

By assignments of error and appropriate propositions of law, appellant attacks the constitutionality of this article; the gist of such contention being that the Legisla-

ture cannot confer upon the court any jurisdiction in equity not in accordance with the recognized principles of equity jurisprudence. It is urged that the Legislature cannot confer upon a court of equity the power to prohibit any one from following a useful profession when the practice of such profession does not in fact amount to a nuisance. It is also urged that it is in violation of the inhibition of the state and federal Constitutions in reference to depriving one of his property rights without due course of law, and in denying him the right of trial by jury as guaranteed by our bill of rights.

[7] The first contention is contrary to the policy of this state as shown by numerous enactments providing for injunction where such right did not lie under the English chancery practice. It may be stated as the settled law of this state that there is recognized a broad power in the Legislature of this state to change the boundaries of equity jurisprudence, as well as to regulate equity procedure, provided such legislation does not destroy or invade a constitutional guaranty. Ex parte Allison, 99 Tex. 455, 90 S. W. 870, 2 L. R. A. (N. S.) 1111, 122 Am. St. Rep. 653; Ex parte Allison, 48 Tex. Cr. R. 634, 90 S. W. 492, 3 L. R. A. (N. S.) 622, 13 Ann. Cas. 684; Clopton v. State (Tex. Civ. App.) 105 S. W. 994; Burckell v. State, 47 Tex. Civ. App. 393, 106 S. W. 190; Ex parte Dupree, 101 Tex. 150, 105 S. W. 493; Ex parte Roper, 61 Tex. Cr. R. 68, 134 S. W. 334; Campbell v. Peacock (Tex. Civ. App.) 176 S. W. 774; State Board of Medical Examiners v. Blair, 57 Utah, 516, 196 P. 221.

The only question then to determine is: Does this enactment invade any constitutional guaranty of the citizen? It is urged that it denies him the right of trial by jury. In our state the right of trial by jury is given in cases of equitable cognizance as well as those of law. In the trial of the instant case, appellant availed himself of this right and was awarded a jury in the case. It is true that if he violates this injunction and is cited for contempt, he will not be accorded a jury hearing; but this is not guaranteed to him by our Constitution, because this guaranty is universally construed to refer only to such cases as the right of trial by jury was given at common law. In cases for contempt no such right was given at common law, and hence no such guaranty is given by our Constitution. If appellant should be cited to answer in contempt, he is not tried for the offense denounced by the statute, but is tried for violating an order of court. The fact that a person enjoined from practice of medicine might be prosecuted for the doing of the very acts for which he was held and punished for contempt invades no guaranty of the citizen's rights. In the criminal case he would be prosecuted for offending against

the law; in the contempt case he would be tried for offending against an order of a court.

The Legislature had the undoubted right to make this additional protection in the interest of the public health and the public welfare and, in so doing, violated no constitutional guaranty to the citizen. The statute is therefore constitutional, and all assignments of error attacking its constitutionality are overruled.

[8] It is urged by proper assignment that the court was in error in instructing a. verdict in this case. The evidence was undisputed and established the fact that appellant was practicing medicine in violation of law and that he had theretofore been convicted of such offense. There was therefore no disputed issue of fact made by the evidence to be submitted to the jury, and it became the duty of the court to construe the legal effect of the evidence and instruct the verdict to be rendered. The assignments of error raising this issue are overruled.

All other assignments of error have been carefully considered, with the result that we find no merit in them. It is therefore the opinion of the court that this case should be affirmed.

Affirmed.

VAUGHAN, J. (dissenting). The writer regrets that there should exist any disagreement on his part with the majority opinion of the court as to the constitutionality of chapter 1, title 90, of the Revised Statutes, and chapter 6, title 12, of the Penal Code, as amended by the Thirty-Eighth Legislature of Texas. The constitutionality of the Medical Practice Act has been quite often before the courts of this state, especially the Court of Criminal Appeals, and as often its constitutionality sustained; and it is only in view of the fact that the constitutionality of the act of the Thirty-Eighth Legislature, or at least some of its provisions, have not been passed upon by the higher courts of the state and the importance of the act in its bearing and operation upon the rights of those of our citizenship engaged in the practice of chiropractic as a science or art of healing, as well as on those who, as patients, believe in the virtue of same, that the writer has been emboldened, and without reserve, to express his views in opposition to the constitutionality of said act. Furthermore, he is reminded that, as to the swift is not always the race, or to the strong the battle, so neither is right with the majority always to be found. This is clearly recognized by one of the cardinal principles of constitutional government, to wit, that Constitutions are made more for the protection of the weak against the strong, or the minority from the power of the majority, than for the strong against the weak or the majority from the minority, and this must be upon the ground that it is not to

be expected that right and justice will always be found in the camp of the majority.

The writer is aware of the great weight of authority sustaining the validity of the provisions of the Medical Practice Act heretofore passed upon, and that only the new provisions of the act of the Thirty-Eighth Legislature present in any measure a virgin field for research, and that, in assailing the validity of same, he assumes the laboring oar.

In this connection a brief review of the rise and progress of the vicissitudes that have attended the advent of the healing art known as "chiropractic" may with some benefit be made. When several of these decisions, possibly most of them cited and relied upon by appellee, were rendered, chiropractic could hardly be called a science, being merely in the embryonic stage, or in the making. Its practice was largely empirical. There was no essential agreement with respect to the general principles upon which this science is founded or as to its practice. Many of those attempting to practice chiropractic were either entirely without education in its science and art, or with very imperfect education. There were schools of chiropractic that could rightly be denominated mere "diploma mills," just as in the case of medicine a little more than a quarter of a century ago in this country. The whole matter of this science and practice was, so to speak, influx. Just as in the case of regular medicine, the science and art of chiropractic have became fixed and systematical. The great schools of chiropractic now extant have essentially the same standardized course, almost invariably a course of three years of six months each. This school of healing is now recognized and in most states placed upon an equal footing with the practice of regular medicine as that term is understood by the courts. The schools are recognized, have separate boards, and separate examinations test the applicant's knowledge of those branches essentially necessary and applicable to the healing art as practiced by him. Repeated decisions show that courts take judicial cognizance of the methods and practice of the regular schools of medicine and what is meant by the practice of regular medicine and surgery and the methods which the M. D.'s and surgeons in general use; and, following the line of reason used by the courts in arriving at the conclusion that judicial cognizance should be taken of those matters, it is the opinion of the writer that courts should take judicial cognizance that chiropractic is a system of healing entirely separate and distinct from the practice of regular medicine, just as judicial cognizance of the fact that the practice of dentistry is different from the practice of regular medicine and requires, in a large measure, a different education.

Article 5741, Revised Statutes, as amended by Acts of Thirty-Eighth Legislature, p. 288, requires the applicant for a license to practice medicine to pass an examination in, among other things, anatomy, physiology, chemistry, histology, pathology, bacteriology, diagnosis, surgery, obstetrics, gynecology, hygiene, and medical jurisprudence. By article 5739, Id., all applicants, to be eligible for examination, must be graduates of reputable medical schools whose courses of instruction are as high as those adopted by the better class of medical schools of the United States and whose course of instruction shall embrace no less than four terms of eight months each. Chiropractic, as shown by the testimony, is a special branch of healing, and of this fact the writer is of the opinion courts should take judicial cognizance. Its practitioners do not practice gynecology, obstetrics, or surgery, and they make no chemical examinations. The testimony shows that the regular standard chiropractic college or school has a three-year course of six months each, and further shows that the long and extended courses of study required for practice of regular medicine are not necessary or of any value to one practicing the chiropractic art of healing.

The provision of the law that no school of medicine should be considered reputable, unless it has at least a four-year course of not less than eight months in each year, manifestly bars all of the standard schools of chiropractic. It is to be assumed that no regular medical school such as would be admitted to the accredited list teaches the chiropractic science of healing. This is evident because the two sciences of medicine and chiropractic, as shown by the testimony, are entirely different. Manifestly, the practitioners of the two schools pursue practically the same course in the two fundamental studies of anatomy and physiology; but, outside of these, just as manifestly the courses would be very dissimilar. It is axiomatic that the state, in the exercise of its police power, can, and should, regulate the practice of the healing art, whether followed by the regular physician or the so-called drugless school. This is based upon the proposition that the citizenship has a right to require, and should require, every practitioner to be educated in his particular line of practice to safeguard, not only the health, but often to protect the very life of people with respect to the practice of healing art; and, within the exercise of such power, the Legislature may, and should, enact reasonable and appropriate laws prescribing qualifications for and regulating the practice of each of the different schools of healing. However, in such regulation, the fact that there are different schools of healing, based upon a different philosophy and having a different science and different methods of practice,

should be recognized. Article 16, § 31; Constitution of the State of Texas 1876. While the Legislature, in the exercise of its police power, may, and should, entirely forbid the exercise of the healing art by charlatans, fakirs, and empirics, because the practice of such people is not only not valuable but is detrimental to the health of the public, yet it cannot absolutely forbid the practice of a business or profession beneficial to the people and not detrimental to the public health and welfare. It may regulate in the exercise of its police power, but it cannot destroy a useful and inoffensive business or profession. Article 14, § 1, Constitution of the United States.

A recognized school of medicine is one having set or organized principles, philosophy, science, and method of healing. 30 cyc. 1571; Grainger v. Still, 187 Mo. 197, 85 S. W. 1114, 70 L. R. A. 49; Nelson v. Harrington, 72 Wis. 591, 40 N. W. 228.

Tested by this definition, is chiropractic a regular recognized school of healing? To determine this the evidence introduced must be looked to. Mr. Harris, an expert chiropractor, testified to the effect that chiropractic effects cures and can do no person any injury; that it is of great value to the public; that chiropractors do not diagnose disease, they simply analyse the spine; that this is done to find whether it is in its natural and proper alignment and each bone thereof in its natural position with respect to adjacent bones. His testimony further shows that chiropractic is a special branch of healing, having to do with the backbone alone; that the chiropractic gives no medicine, prescribes no hospital treatment nor dieting, and does not perform any surgical operations; that he uses his hands alone in the adjustment of the bones of the spine, and in replacing them in their natural position.

Manifestly, this testimony shows that the study of drugs is not necessary to the chiropractic art of healing; that the study of embriology is not necessary; that the study of bacteriology, to the extent and as taught in medical schools, is not necessary; that ordinary diagnosis is not necessary; that the study of anatomy, especially of the nerves and bony structure, and the study of physiology, are extremely important and necessary; that the study of symptomatology is necessary to enable the chiropractic to determine whether he is obtaining the results which should be obtained through his adjustment; that the study of the brain and its functions and of the functions and structure of the nerves must be thoroughly pursued; and that there must be connected with chiropractic an extensive clinical experience to enable the chiropractic to discover the maladjustments and to apply with proper force, in the proper manner, to secure a readjustment of the spine.

The testimony of this witness further shows that the chiropractic schools require a three-year course of six months each; that this was required in the Carver School of Chiropractic, of which he was a graduate; that said school has about 4,000 students.

The Legislature in the exercise of its police power is prohibited by article 16, § 31, supra, from discriminating between different methods of healing. Each and every law must be equal upon all following the same or similar business.

In the opinion of the writer it has been shown that there are different schools of medicine or healing, notably, the regular schools where the practice of medicine and surgery is taught, and chiropractic schools, and that the chiropractic as well as the regular schools of medicine is a recognized school or system of healing. Therefore the Medical Practice Act passed for the purpose of regulating the practice of medicine or healing, in order not to be discriminating between such different schools, should have provided for an education and examination appropriate to each particular school, and not simply appropriate to and fitted for some other or particular school of healing; and that, in not conforming to these principles and to that extent, the above act is unconstitutional and void. This, although the act on its face appears to be just and fair to all schools alike, in that, if the medical board, in carrying out the provisions of same, violates the above requirements or any of them, it thereby deprives the person injured of a constitutional right, and such person would be within his rights in disregarding and refusing to conform to such practice of the board.

It is asserted that chiropractic is not excluded by the provisions of said act; that a chiropractor, on complying with the rules and regulations therein prescribed, may practice in Texas. True, to this extent the law is fair upon its face, and does not, by the language employed, discriminate between any of the schools of medicine embraced within its terms, but the purpose of this statute must be determined from the natural effect of the statute when put into operation and not from the proclaimed purpose. Lochner v. New York, 198 U. S. 45, 25 S. Ct. 539, 49 L. Ed. 937, 944, 3 Ann. Cas. 1133.

What is the natural effect of this legislative enactment when put in operation? First, to discriminate between the chiropractic school of healing, which only requires a course of three years of six months each, in favor of the regular schools of medicine requiring four terms of eight months each, and, further, in that the chiropractor is required to attend such a school teaching all of the courses provided in said act, of which three are absolutely useless and unnecessary to the chiropractor in order to practice the

chiropractic art of healing. It being shown that the chiropractic school of healing is a regular systematic school, benefiting the community and not injuring it, it is the opinion of the writer that it cannot, by the device of said legislative enactment or of the medical board acting thereunder in carrying out its terms and provisions, be excluded and forbidden in the state of Texas. What will be, in fact, the effect of the statute and the effect of the action of the board under the provisions of same if permitted to stand and to be enforced as sought in the case at bar? In the opinion of the writer, it is manifest that the effect will be to destroy chiropractic in the state of Texas and to prevent the practice of this school of healing, unless the chiropractor abandons the chiropractic school of healing and conforms to the unnecessary and burdensome requirement of the act. This is unjust discrimination, pure and simple, and not in the interest of the public health or service. It would be but denying to the chiropractor the wholesome rule of law announced by Mr. Justice Bradley in Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co., 111 U. S. 746, 4 S. Ct. 652, 28 L. Ed. 585, to wit:

"The right to follow any of the common occupations of life is an inalienable right; it was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence. * * * This right is a large ingredient in the civil liberty of the citizen. * * * I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States. * * * But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it—it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen."

That courts should look beyond the placid and innocent face of the law in order to determine the validity of its enactment, so as to prevent wrongs from being covertly inflicted upon any of the citizenship through the enforcement of its provisions, is recognized by the Supreme Court of the United States in the following cases: Minnesota v. Barber, 136 U. S. 313, 10 S. Ct. 862, 34 L. Ed. 455; Brimmer v. Rebman, 138 U. S. 78, 11 S. Ct. 213, 34 L. Ed. 862; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220. It has often been held that courts will scrutinize legislative enactments closely when the constitutionality of same is called into question, in order to see to it that rights are not invaded in the guise of some legislative enactment not authorized by or contrary to the organic law of the land. In this respect it has been well and fittingly said that—

"It is impossible for us to shut our eyes to the fact that many of the laws of this character, which passed under what is claimed to be police power for the purpose of protecting the public health or welfare, are in reality passed for other motives. We are justified in saying so, when, from the character of the law and subject upon which it legislates, it is apparent that the public health or welfare bears but remote relation to the law. The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose."

This is performed in the discharge of the solemn duty imposed upon courts to guard the constitutional rights of the citizen against merely arbitrary power. It is the purpose of the organic law on which our federal and state governments are founded, and which should always be borne in mind by courts, that there shall be accorded to all citizens alike equal and exact justice, and that no legislative enactment shall stand which carries on its face, or covertly, unjust discrimination between persons in similar circumstances material to their rights, whether as a class or as individuals. The law as passed, in all of its requirements, is just to that class of practitioners whose schools require attendance for four terms of eight months a year, the curriculums of which require the branches to be taught as stated in the act for the purpose of completing the course required by such schools, but is unjust discrimination in its requirements that other recognized schools of medicine or healing shall unnecessarily conform to such requirements, with the penalty that, unless the graduates of such other schools do comply therewith, they shall not be permitted to practice the art of healing as taught, for instance, by the chiropractic schools. This is in direct conflict with the following well-recognized rule of law:

"The rights of every individual must stand or fall by the same rule of law that governs every other member of the body politic under similar circumstances; and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by restricting the privileges of certain classes of citizens and not of others, when there is no public necessity for such discrimination, is unconstitutional and void."

The act is discriminatory and unreasonable, in that it requires a chiropractor to study many branches which are of value only to the regular practitioner, and the examination provides for no examination in the science and art of chiropractic. Some of the

studies required in article 5741, supra, the chiropractor, of course, in common with the regular physician, is taught in his school, which is especially true of anatomy, histology, and physiology. Others of this list of branches manifestly the chiropractor has no use for. The chiropractor studies symptomatology, not for the purpose of diagnosing the disease and applying specific remedy to it, but for the purpose of knowing whether the results of his work are satisfactory. The pathology that he is taught and should know is not manifestly the same as taught in the medical schools; it is a special pathology, suitable to his theory of practice. These facts appear from the testimony and are perfectly obvious. There is no requirement in article 5741 under which the chiropractor can be examined in his school of healing. The examination required of a chiropractor should be one calculated to test his knowledge of the philosophy, science, art, and practice of his particular school of healing. People v. Love, 298 Ill. 304, 131 N. E. 809, 16 A. L. R. 703. An examination by regular medical doctors restricted to the study as taught in the regular schools of medicine, and of use to the regular practitioner only, is not a fair examination. Suppose all physicians and surgeons were required to pass an examination in the branches taught in a chiropractic school, could such an examination be considered fair and reasonable? Certainly not. It would be unfair to the practitioner and to the public he serves, and would be absolutely unreasonable because it would not tend at all to test his fitness for the practice of medicine and surgery. To-day, in the regular schools, almost as much time is given to surgery and surgical treatments as to all other studies. It is the most important part of modern medicine. Chiropractic being a separate system, based upon a different philosophy and method of practice, it is certainly discriminatory and unreasonable to require the chiropractor to pass such an examination as the statute provides. People v. Love, supra. A statute similar in its enactment, scope, and effect has been recently before the Supreme Court of North Carolina in the case of State v. Biggs, 133 N. C. 730, 46 S. E. 401, 64 L. R. A. 139, 98 Am. St. Rep. 731, from which the following quotation is made as aptly applying to the facts of this case:

"It is not only in the scope of the police power for the state to regulate the 'practice of medicine and surgery' and to throw around the public any reasonable protection against unfit members of that honorable profession and provide against malpractice, but the General Assembly can prohibit any pretended art of healing which is calculated to deceive and injure the public. It is also within its power to protect the public against the ignorant and vicious who profess knowledge and skill in any art or profession of healing in which technical knowledge and learning are required to

safely and properly practice it. But it is not found here that the defendant is deceiving and injuring the public or is ignorant and incompetent, to the detriment of the public, in the application of the methods he uses. It may be that if he were not there some of the patients might call in an M. D., but that is due possibly to the ignorance or perversity of the patients who may prefer the defendant's methods and scale of fees. The police power does not extend to such cases."

Likewise, the Supreme Court of Tennessee recently passed upon a statute in many respects similar to the Texas statute, to wit, in the case of Hastings et al. v. Norman et al., (not yet published), from which the following extract is quoted as being peculiarly applicable to the case under discussion:

"The court thinks that chiropractors cannot be classed along with charlatans and fakirs. This science of healing is well developed and recognized in many jurisdictions and many believe in its efficacy. It is not suggested on the record that the practice of the science is in any way deleterious to the human body.

"Our statutes undertake to provide that no one shall practice any healing art until he has been examined by our various boards and duly licensed. As a condition to obtaining license, the applicant must pursue a course of study covering many subjects. Chiropractors have no occasion to apply much of this learning. The court is of the opinion that since their treatments are not shown to be injurious to anybody—they do not give medicine, operate, or subject the body to injurious manipulation—the requirement that they study and be examined on subjects in no way pertaining to their occupation is an arbitrary and unreasonable attempt to restrict their liberties and the liberty of the people who wish to patronize them. Such regulations have no reasonable tendency to promote the public safety and welfare.

"The court recognizes fully the power of Legislature to regulate the practice of chiropractic by appropriate legislation. A board may be created to do this, or the present board empowered to regulate this profession under suitable regulations; an innocent business, however, cannot be prohibited under the guise of regulation.

"Our statutes, therefore, if they may be said to prohibit the practice of chiropractic, are invalid to this extent."

Therefore, it is the opinion of the writer that said Medical Practice Act is, as pointed out, in conflict with article 16, § 31, of our state Constitution, and article 14, § 1, of our federal Constitution.

The above presents the reason for the position of the writer anent the constitutionality of said legislative enactment, and why he dissents from the majority view. Therefore, no necessity exists to further prolong the discussion of the principle involved by reviewing especially the many cases that may be found contrary to those cited by the writer in sup-

port of the conclusion reached by him, in order to demonstrate the merit or demerit of the cases cited in the majority and this dissenting opinion.